Stanley BOIM, individually and as administrator of the Estate of David Boim, deceased, and Joyce Boim, Plaintiffs–Appellees,

v.

**HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT, et al., Defendants–Appellants.**

Nos. 05–1815, 05–1816, 05–1821, 05–1822.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 30, 2005.

Decided Dec. 28, 2007.

Stephen J. Landes, Wildman, Harrold, Allen & Dixon, Chicago, IL, Nathan Lewin (argued), Lewin & Lewin, Washington, DC, for Plaintiffs–Appellees.

John W. Boyd, Freedman, Boyd, Daniels, Peifer, Hollander, Guttman & Goldbe, Albuquerque, NM, Matthew J. Piers (argued), Frederick S. Rhine, Mary M. Rowland, Gessler Hughes Socol Piers Resnick & Dym, John M. Beal, James R. Fennerty, Brendan Shiller, Chicago, IL, for Defendants–Appellants.

David Seidman, Schwartz, Cooper, Greenberger & Krauss, Chicago, IL, for Jewish Community Relations Council of the Jewish United Fund of Metropolitan Chicago.

Daniel Elbaum, Anti–Defamation League, Jonathan K. Baum, Katten Muchin Rosenman, Chicago, IL, for Anti–Defamation League.

Before ROVNER, WOOD, and EVANS, Circuit Judges.

ROVNER, Circuit Judge.

This lawsuit has its origins in the murder of David Boim more than ten years ago. David, a citizen of both Israel and the United States, was living with his parents in Israel when he was gunned down while waiting for a bus in the West Bank outside of Jerusalem. He was apparently shot at random by gunmen believed to be acting on behalf of the terrorist organization Hamas.

Section 2333 of the United States Criminal Code grants U.S. nationals injured by acts of international terrorism the right to sue for treble damages in federal court. David's parents, Stanley and Joyce Boim, on behalf of themselves and David's estate, filed suit under this statute against not only the two men believed to have shot David, but an array of individuals and organizations in the United States with alleged connections to Hamas. Broadly speaking, the Boims' theory as to the latter group of defendants was that in promoting, raising money for, and otherwise

working on behalf of Hamas, these defendants had helped to fund, train, and arm the terrorists who had killed their son. In *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000 (7th Cir.2002) ("*Boim I*"), we sustained the viability of the Boims' complaint, concluding that liability under section 2333 attached not only to the persons who committed terrorist acts, but to all those individuals and organizations along the causal chain of terrorism.

On remand, the district court found appellants Muhammad Abdul Hamid Khalil Salah ("Salah"), Holy Land Foundation for Relief and Development ("HLF"), and American Muslim Society ("AMS") liable to the Boims on summary judgment. *Boim v. Quranic Literacy Inst.*, 340 F.Supp.2d 885 (N.D.Ill.2004). At the conclusion of a trial, a jury concluded that appellant Quranic Literacy Institute ("QLI") also was liable. The jury awarded damages of $52 million, which the district court trebled to $156 million. Salah, HLF, AMS, and QLI all appeal.[1]

Salah, HLF, and AMS contend that the criteria employed by the district court for imposing liability were incomplete or incorrect and that the evidence adduced below did not suffice to impose liability. QLI complains of the district court's refusal to continue the trial date after the court's summary judgment rulings left it as the sole defendant facing a trial on liability; it also contends that the district court erred in *sua sponte* entering partial summary judgment against QLI as to one aspect of liability.

We reverse the entry of partial summary judgment as to liability against defendants HLF, AMS, and Salah. As to HLF, we conclude that the district court erred in giving collateral estoppel effect to the District of Columbia Circuit's finding that HLF funds the terrorist activities of Hamas. As to AMS and Salah, we conclude that the district court erroneously relieved the Boims of the burden of showing that these defendants' actions were a cause in fact of David Boim's death. As to QLI, we conclude that the district court erred in *sua sponte* and without prior notice applying its summary judgment determination against the other defendants that Hamas was responsible for the murder of David Boim, to QLI, against whom the Boims did not seek summary judgment. However, the district court did not abuse its discretion when it denied QLI's request to continue the trial date.

In light of the errors in the summary judgment rulings below, we vacate the judgments entered against these four appellants and remand for further proceedings. On remand, the Boims will have to demonstrate an adequate causal link between the death of David Boim and the actions of HLF, Salah, and AMS. This will require evidence that the conduct of each defendant, be it direct involvement with or support of Hamas's terrorist activities or indirect support of Hamas or its affiliates, helped bring about the terrorist attack that ended David Boim's life. A defendant's conduct need not have been the sole or predominant cause of the attack; on the contrary, consistent with the intent of Congress that liability for terrorism extend the full length of the causal chain, even conduct that indirectly facilitated Hamas's terrorist activities might render a defendant liable for the death of David Boim. But the plaintiffs must be able to produce some evidence permitting a jury to find that the activities of HLF, Salah, and AMS

---

**1.** The district court deemed a number of other defendants jointly and several liable for the judgment. No other defendants have appealed, however, and their liability consequently is not before us.

contributed to the fatal attack on David Boim and were therefore a cause in fact of his death. Absent such proof, those appellants will be entitled to judgment in their favor. As to QLI, which has not challenged the liability standard employed by the district court, the remand will be limited to the question of whether Hamas was responsible for the murder of David Boim. QLI will be given the opportunity (of which it was deprived by the district court's *sua sponte* summary judgment ruling) to attempt to demonstrate that there exists a dispute of material fact on this point.

## I.

### A.

The Boims moved to Israel from the United States in 1985 to pursue a more spiritual life. David was fifth of the Boim's seven children. In 1996, David was finishing his third year of high school and preparing to apply for college. He was an intelligent and determined student who dreamed of becoming a doctor. His classmates knew him as a warm, outgoing young man. "His trademark was his hug and his smile," recalled Yechiel Gellman, a friend and classmate. His mother described him as a peacemaker.

David studied in a yeshiva near Beit–El, a small West Bank village north of Jerusalem. By 3:30 p.m. on May 13, 1996, the school day had concluded. David and several of his classmates had gathered at a bus stop on a busy road between Jerusalem and Nablus. It was a hot, early-summer afternoon, and the boys were telling jokes and sharing stories as they awaited the bus that would carry them to Jerusalem, where they were taking a class to prepare them for their college entrance

examinations. Shortly before 4:00 p.m., a car pulled off the road and stopped ten feet away from the assemblage of people at the bus stop; one or more of the car's occupants then opened fire. Gellman estimated that a total of thirty shots were fired; he could hear the bullets shrieking past his head. "[To] this day, I don't understand how I survived the shooting." He heard his friend Yair cry out, and he turned to see both Yair and David fall to the ground. David had been shot in the head. A passing dentist stopped and tried to revive him. He was subsequently evacuated by ambulance to a local hospital and then transferred to a second hospital for surgery. He died shortly after he was taken into the operating room. He was buried in Jerusalem that same evening after a service attended by his classmates and thousands of other mourners. "Part of me was taken away" the day he died, Joyce Boim would later testify. David was seventeen years old.

### B.

The murder of David Boim was later attributed to two individuals: Amjad Hinawi and Khalil Tawfiq Al–Sharif. Both were apprehended by the Palestinian Authority in 1997 and then released pending trial. Al–Sharif killed himself in a suicide bombing at a shopping mall in Jerusalem later that same year. Hinawi was tried by a Palestinian Authority tribunal and convicted of participating in a terrorist attack and being an accomplice to Boim's murder. He was sentenced to ten years of hard labor.

Both Al–Sharif and Hinawi were believed to be members of the terrorist or "military" wing of Hamas.[2,3] Hamas is an

---

2. The parties and the witnesses below have referred to the terrorist wing of Hamas as its

"military" wing. We shall do the same, withholding judgment as to whether use of the

organization that was founded in 1987 as an outgrowth of the Muslim Brotherhood in Egypt. Its name is derived from an acronym for "Harakat al-Muqawama al-Islamiyya," which in English means the "Islamic Resistance Movement." Its charter, written in 1988, calls for the obliteration of the State of Israel and the establishment of an Islamic republic in the area now comprising Israel, the West Bank, and the Gaza Strip. Soon after its founding, Hamas began to engage in terrorist attacks on both civilian and military targets. It was officially designated a terrorist organization by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") on January 24, 1995. That designation made it illegal for a United States citizen or entity to engage in any transactions or dealings involving the property or interests of Hamas without license to do so. Hamas was subsequently deemed a foreign terrorist organization by the United States Secretary of State on October 8, 1997, a designation that made it illegal for anyone within the United States or subject to its jurisdiction to provide material support or resources to Hamas.

In addition to its military wing, Hamas has a political wing that advocates on behalf of the Palestinian people. Hamas also operates a network of social institutions known as Da'wa which provide medical care, schooling, and other services to Palestinians living in and around the Gaza Strip and the West Bank. Hamas's charitable endeavors have helped it to achieve a position of influence among the Palestinian

people. That influence was evident in the 2006 election of Hamas candidates to governing positions within the Palestinian Authority. *See Zahren v. Gonzales,* 487 F.3d 1039, 1040 (7th Cir.2007).

## C.

Pursuant to section 2333, Joyce and Stanley Boim sued a variety of individuals and organizations for their son's death. Joyce Boim would later testify that their aim was to keep "even one nickel" from Hamas that might be used for further terrorist acts like the murder of her son. In addition to Hinawi and Al–Sharif, to whom the murder of David Boim was directly attributed, the Boims' amended complaint named as defendants a variety of individuals and organizations with ties to Hamas. Among them are the four appellants:

1. Salah is a naturalized United States citizen who allegedly has served as the U.S.-based leader of Hamas's military wing. Salah was arrested at a Gaza checkpoint in January 1993 by Israeli military authorities and was subsequently charged with being an active member of, holding office in, and performing services for an illicit organization (Hamas), engaging in activity against the public order and undermining regional security, and providing shelter to terrorists. Salah ultimately pleaded guilty to these offenses and was incarcerated in Israel until his release in or around November 1997. In 1995, while

---

term "military" is appropriate in reference to terrorist activities.

**3.** We say "believed to be" because not all of the defendants have conceded that Al–Sharif and Hinawi were members of Hamas and that they murdered David Boim in furtherance of Hamas-sponsored terrorism. Although AMS/IAP concedes the point, one defendant's concession cannot bind another.

Similarly, although a default judgment was entered against Hinwai, his default cannot bind the other defendants, as we discuss *infra* at 752. As we further discuss, there is an array of problems with the evidence that the Boims have offered in order to establish that Al–Sharif and Hinawi were members of Hamas and that Hamas was responsible for David's murder. *See infra* at 752–54.

he was incarcerated in Israel, the U.S. Treasury Department's OFAC added Salah to the government's list of specially designated terrorists. After he was released by the Israeli military authorities, Salah returned to the United States. In 2004, a grand jury in the Northern District of Illinois indicted Salah and others for: conspiring (beginning in 1988) to conduct and participate in the affairs of an enterprise (Hamas) through a pattern of criminal acts (including murder, kidnaping, hostage taking, money laundering, obstruction of justice, and forgery) in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) ("RICO"); knowingly providing and attempting to provide material support and resources to a foreign terrorist organization (Hamas) in violation of 18 U.S.C. § 2339B; and endeavoring to obstruct justice by giving false and misleading verified answers to interrogatories posed by the Boims in the instant civil litigation, in violation of 18 U.S.C. § 1503. The government dropped the material support charge shortly before trial. In February of this year, following a three-month trial, a jury acquitted Salah of the RICO conspiracy charge and convicted him of the obstruction charge. On July 11, 2007, the district court sentenced Salah to a prison term of twenty-one months on that charge.

2. HLF is an organization incorporated in the United States that the U.S. government has determined provided financial support to Hamas; it was effectively shut down by the government on that basis in 2001. HLF was incorporated as the Occupied Land Fund in California in 1989. It changed its name to HLF and relocated to Texas in 1992. It is a not-for-profit organization which purported to fund humanitarian relief for Palestinian people in the West Bank, Gaza, and beyond. At one time, HLF described itself as the largest Muslim charity in the United States. As discussed in greater detail below, the government named HLF a specially designated terrorist organization and froze its assets in 2001 based on evidence that it supplied funds to Hamas and/or organizations affiliated with Hamas. In 2004, the government indicted HLF and seven of its principals for, *inter alia*, providing and conspiring to provide material support and resources to a foreign terrorist organization (Hamas) in violation of 18 U.S.C. § 2339B(a)(1). The indictment alleges that HLF channeled substantial financial support to Hamas through ostensibly charitable committees and organizations affiliated with Hamas. A two-month trial in the Northern District of Texas recently ended in a mistrial after the jury was unable to reach a verdict as to most of the charges, including those against HLF.

3. AMS is a now-defunct organization incorporated in the United States which did business as the Islamic Association of Palestine (IAP). Over time there have been multiple AMS/IAP entities at the local and national levels. The Boims' theory is that they all constituted a single entity, a proposition with which the district court agreed. 340 F.Supp.2d at 906–08. We shall refer to this entity as AMS/IAP. AMS/IAP allegedly provided financial support to Hamas through HLF. IAP, which was headquartered in Chicago, described itself as a not-for-profit, grass-roots organization dedicated to advancing a just, comprehensive, and eternal solution to the cause of the Palestine people through political, social, and educational efforts. The U.S. government considers IAP to have acted as a front for Hamas in the U.S. by, for example, reprinting Hamas communiqués in its periodical publications.

4. QLI is another U.S. organization that allegedly raised and laundered money for Hamas. QLI is an Illinois not-for-profit organization that was incorporated

in 1990 and has operated in the Chicago area since that time. Ostensibly, its central endeavor was to undertake an authoritative translation into English of the principal texts of Islam. Salah worked for QLI beginning in the late 1980s or early 1990s and until 1993, when he was arrested in Israel. According to the plaintiffs, QLI aided Hamas and Salah in two ways: it gave cover to Salah by providing him with apparently legitimate employment while he was actually working on Hamas's behalf, and it helped to raise money for and funnel money to Hamas.

### D.

Section 2333(a) permits U.S. nationals who have been injured "by reason of an act of international terrorism" to sue for their injuries in federal court and to recover treble damages. "International terrorism" is in turn defined to include conduct that (a) "involve[s] violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State"; (b) appears intended "to intimidate or coerce a civilian population," to influence government policy through intimidation or coercion, or to affect the conduct of government by means of mass destruction, assassination, or kidnaping; and (c) occurs primarily outside of the United States or transcends national boundaries. 18 U.S.C. § 2331(1). It is both a fair inference—and undisputed—that the murder of David Boim constitutes an act of international terrorism as so defined and that Stanley and Joyce Boim (and of course David, represented in this suit by his father as the administrator of his estate) were injured thereby. It is equally plain that the individuals who themselves killed David—purportedly Hinawi and Al-Sharif—would be liable to the Boims under

section 2333; and, indeed, a default judgment was entered against Hinawi below. (The Boims sued Al-Sharif's estate, but after they were unsuccessful in attempting service, the estate was dismissed from the suit.) We may also assume that Hamas, upon proof that Hinawi and Al-Sharif committed the murder at its behest or with its support, likewise would be liable to the Boims, although Hamas has not been named a defendant in this suit. But what has been vigorously disputed from the inception of this litigation is whether and under what circumstances persons and groups who allegedly have provided money and other support to Hamas (directly and indirectly) may also be liable for David's murder.

Salah, HLF, AMS, and QLI all moved to dismiss the Boims' complaint for failure to state a claim against them, and in *Boim I*, we affirmed the district court's decision not to do so. We concluded that section 2333 reflects an intent by Congress to allow a U.S. national injured by reason of international terrorism to recover from anyone along the causal chain of terrorism and that liability is not limited to those who commit the violent act that causes injury. 291 F.3d at 1010–11. Thus, to the extent that a third party had provided money or other support to a terrorist who engaged in a terrorist act, that party potentially could be held liable for the resulting injury along with the terrorist himself. *See id.*

However, in response to the first of three questions the district court had certified for interlocutory review, we did reject the proposition that merely giving money to an organization engaged in terrorism, without more, would constitute an act of international terrorism sufficient to render the donor liable under section 2333. *Id.* at 1011.

To say that funding *simpliciter* constitutes an act of terrorism is to give the statute an almost unlimited reach. Any act which turns out to facilitate terrorism, however remote that act may be from actual violence and regardless of the actor's intent, could be construed to "involve" terrorism. Without also requiring the plaintiffs to show knowledge of and intent to further the payee's violent criminal acts, such a broad definition might also lead to constitutional infirmities by punishing mere association with groups that engage in terrorism....

*Id.* So merely giving money to Hamas or a Hamas-affiliated entity would not by itself suffice to establish civil liability under section 2333 for terrorist acts committed by the agents of Hamas. *Id.* The Boims would have to show that the donor was aware of Hamas's terrorist activities and intended to further those activities, *id.,* and also that the murder of David Boim "was a reasonably foreseeable result of making the donation," *id.* at 1012.

We went on to conclude, in answer to the second question certified by the district court, that knowingly and intentionally providing material support, including but not limited to financial support, to terrorist organizations and activities—conduct that is now separately forbidden by the U.S. Criminal Code, *see* 18 U.S.C. §§ 2339A and 2339B—would also constitute an act of international terrorism for purposes of section 2333. *Boim I,* 291 F.3d at 1014–15. Section 2339A makes it a crime to provide material support or resources knowing or intending that they be

used in the commission of specified violent acts, while section 2339B makes it a crime to knowingly provide material support or resources to an organization that the United States has designated a foreign terrorist organization pursuant to 8 U.S.C. § 1189(a). Thus, those injured by reason of the knowing and intentional financing of terrorist organizations and activities as proscribed by these two statutory provisions would be entitled to recover under section 2333, provided that causation can be shown as in traditional tort law. 291 F.3d at 1015. Financial support need not be substantial in order to qualify as material support; "even small donations made knowingly and intentionally in support of terrorism may meet the standard for civil liability under section 2333." *Id.*[4]

Finally, we answered the last of the certified questions by holding that aiding and abetting an act of international terrorism would also support liability under section 2333. "The statute would have little effect if liability were limited to those who pull the trigger or plant the bomb because such persons are unlikely to have assets, much less assets in the United States, and would not be deterred by the statute." *Id.* at 1021. Thus, those who knowingly and intentionally aid terrorist acts by providing funds or other support to those who commit the acts could be held liable under the statute, consistent with "Congress' clearly expressed intent to cut off the flow of money to terrorists at every point along the causal chain of violence." *Id.* To establish a defendant's liability for aiding and abetting the terrorist acts of an organization like Hamas, the plaintiff would have

---

**4.** As we made clear elsewhere in our opinion, we were citing sections 2339A and 2339B and the conduct they criminalize solely to illustrate the types of activity that might qualify as acts of international terrorism for purposes of section 2333; we were not suggesting that the Boims would have to establish a violation of either of these two criminal statutes in order to prevail under section 2333. Indeed, section 2339B was not enacted until 1996, and Hamas was not designated a foreign terrorist organization to which section 2339B prohibits financial support until 1997, after David Boim was murdered.

to show that the defendant knew of Hamas's illegal activities, that the defendant desired to help those activities succeed, and that the defendant engaged in some act of helping the illegal conduct. *Id.* at 1023; *see also id.* at 1021.

We rejected the contention of HLF and QLI that holding them liable under section 2333 might contravene the First Amendment by penalizing them for mere association with Hamas. Although section 2333 on its face requires more than mere association with a terrorist organization as a predicate to liability, 291 F.3d at 1022, the defendants suggested that they were exposed to liability simply for providing money to Hamas even if their intent was to fund its ostensibly legitimate, humanitarian activities, *id.* However, we found the premise of this argument to be mistaken insofar as plaintiffs were seeking to hold HLF and QLI liable on the theory that they had aided and abetted David Boim's murder based on their alleged financial ties to Hamas. In outlining the elements of aiding and abetting liability, we said that plaintiffs must prove that the defendant knew of Hamas's illegal activities, desired to help those illegal activities succeed, and engaged in some act of helping those activities. *Id.* at 1023. If all of this were shown, then imposing liability would be consonant with the principles articulated in *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 920, 102 S.Ct. 3409, 3429, 73 L.Ed.2d 1215 (1982), which held that "[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." We explained:

> The Boims are not seeking to hold HLF and QLI liable for their mere association

with Hamas, nor are they seeking to hold the defendants liable for contributing money for humanitarian efforts. Rather, they are seeking to hold them liable for aiding and abetting murder by supplying the money to buy the weapons, train the shooters, and compensate the families of the murderers. That Hamas may engage in legitimate advocacy or humanitarian efforts is irrelevant for First Amendment purposes if HLF and QLI knew about Hamas' illegal operations and intended to help Hamas accomplish those illegal goals when they contributed money to the organization.

291 F.3d at 1024. In sum, plaintiffs could not prevail on an aiding and abetting theory without proving that the defendants' intent was to help Hamas succeed in its terrorist aims.[5]

Having concluded that the Boims' complaint asserted viable claims against these defendants, we affirmed the district court's decision not to dismiss the complaint. While the appeal was pending, the defendants had consented to final disposition before Magistrate Judge Arlander Keys, the designated magistrate. In the wake of this court's decision in *Boim I,* the Boims amended their complaint to include allegations that the defendants had engaged in a conspiracy to promote Hamas and to raise money in the United States for Hamas's terrorist activities. R. 203 ¶¶ 36, 55, 56. Discovery concluded in April 2004, and shortly thereafter the parties filed cross-motions for summary judgment.

In November 2004, Magistrate Judge Keys ruled on the motions for summary judgment. He denied the motions of defendants Salah, HLF, AMS/IAP, and QLI, and granted the Boims' motion for partial summary judgment against defendants Sa-

---

5. We went on to reject another First Amendment challenge focused on section 2339B. Our holding in that regard is discussed *infra* at 728–30 n. 8.

lah, HLF, and AMS/IAP, deeming them liable to the Boims for damages that were to be determined subsequently at trial. 340 F.Supp.2d 885.

The court found HLF liable based on two key determinations. First, the court granted collateral estoppel effect to the District of Columbia Circuit's determination—in litigation challenging the Treasury Department's finding that HLF constituted a specially designated terrorist organization—that HLF funded Hamas and, indeed, that the proof of this funding was incontrovertible. 340 F.Supp.2d at 903–06; see *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C.Cir.2003). Second, looking at the summary judgment record in this case, the court found there to be no dispute that Hamas was responsible for the murder of David Boim. 340 F.Supp.2d at 899.

The court proceeded to find AMS/IAP liable to the Boims. The Boims' theory was that AMS/IAP had supported Hamas by paying for Hamas leaders to come to the United States in order to attend and speak at conferences, helping to distribute pro-Hamas literature and propaganda, and using that literature and propaganda to solicit donations for Hamas's cause, and on the basis of this support was liable for David Boim's murder, which AMS/IAP conceded was committed at Hamas's behest.

The district court understood our opinion in *Boim I* to say that AMS/IAP could be liable to the Boims so long as it was aware of Hamas's illegal activities, it wished to help those activities succeed, and it engaged in some act of assistance. 340 F.Supp.2d at 906. Thus, without saying so, the court was relying on our articulation of the aiding and abetting theory of liability as the governing standard.

The court found that each of these elements had been met. With respect to the first requirement, the court discerned no dispute that AMS/IAP had knowledge of Hamas's illegal activity. *Id.* As for intent, the court observed at the outset that there was one AMS/IAP organization manifested in multiple incarnations, so as the court considered whether IAP and AMS desired to help Hamas's terrorist activities succeed and engaged in some act of assistance, it was fair to attribute the acts of the various IAP entities to one another; the court thus rejected the efforts of IAP and AMS to attribute responsibility for various acts to different IAP entities. *Id.* at 906–08. Having made that threshold determination, the court proceeded to find that there was an "abundance" of evidence indicating that IAP and AMS desired to and did support Hamas. *Id.* at 908. Specifically, the record indicated that AMS/IAP had participated in a 1993 meeting in Philadelphia with Hamas members and Hamas sympathizers at which various ways to support Hamas were discussed, engaged in fundraising for HLF (which in turn funneled money to Hamas), published and distributed pro-Hamas documents, and held conferences at which Hamas terrorist speakers were featured. *Id.* at 908–13. Although IAP and AMS had submitted a declaration of Rafeeq Jaber (who had been president of AMS since 1993, and who had been president of the national IAP organization from 1996 to 1998 and from 1999 onward) in which Jaber denied that AMS/IAP had given any aid to Hamas's terrorist activities and had any intent to do so, the court rejected these denials as conclusory and self-serving. *Id.* at 913.

In sum, the court concluded that the undisputed facts were sufficient to render AMS/IAP liable to the Boims for having aided and abetted Hamas. The court did not render any finding as to whether AMS/IAP had aided a particular wrongful act or

series of acts that had a causal connection to David Boim's death. *See id.*

Turning to Salah, the court found the undisputed facts sufficient to establish his deliberate support of Hamas's terrorist activity. Again the court cited our discussing of aiding and abetting liability in *Boim I* as the source of the governing standard. 340 F.Supp.2d at 913. The court cited a variety of evidence indicating that Salah had provided support to Hamas, including Salah's guilty plea in an Israeli military court to being an active member of Hamas, holding office in Hamas, and performing services for Hamas, as well as an August 21, 1995 statement detailing Salah's involvement with Hamas that Salah had written while in Israeli custody to other detainees whom he believed to be Palestinian prisoners.[6] Although Salah had raised questions about the voluntariness of his plea, the district court found there to be "an abundance of evidence" corroborating both his plea and the 1995 statement. 340 F.Supp.2d at 920. That evidence included bank records and a memorandum prepared by FBI counterterrorism expert Dale L. Watson (which among other things detailed Salah's role in Hamas and his involvement with many individuals known to the American and Israeli governments as Hamas terrorists). *Id.* at 920–22; *see infra* at 721. Beyond challenging the admissibility of some of the evidence documenting his ties to Hamas, Salah had not rebutted that evidence, the court noted. *Id.* at 922. Additionally, when deposed by the Boims and again in response to many of the averments of the Boims' statement of undisputed facts, Salah had invoked the Fifth Amendment and refused to answer the questions put to him regarding his involvement with Hamas. *Id.* at 922–23. That invocation gave rise to a negative inference that, had Salah answered, he would have incriminated himself. *Id.* at 923. Based on this record, the court concluded that the Boims had established all three elements of aiding and abetting liability as to Salah and that no factual questions remained for a jury to resolve as to those elements. *Id.*

The court rejected Salah's contention that he was no longer involved with Hamas following his January 1993 arrest in Israel and that, consequently, the Boims could establish no link between his activities in support of Hamas and David Boim's death in 1996. The court found that proof of such a link was not required. *Id.*

> The Seventh Circuit did not say that, to impose liability under § 2333, the Boims have to link Mr. Salah or any of the other defendants specifically to the attack that killed David Boim; rather, the court held that to impose liability for aiding and abetting—that is, providing material support to—a terrorist organization, the Boims need only show that the defendants knew of Hamas' illegal activities, that they desired to help those activities succeed, and that they engaged in some act of helping. *Boim*, 291 F.3d at 1028. The evidence shows that all three are true with respect to Mr. Salah, and no reasonable jury could find otherwise.

340 F.Supp.2d at 923.[7] In any case, the court added, under established civil con-

---

**6.** In that statement, Salah had detailed his relationship with Mousa Abu Marzook, who was the acknowledged leader of Hamas's political wing and who had admitted raising money for Hamas; described various meetings that he had with Marzook; indicated that he distributed hundreds of thousands of dol-lars in Gaza and the West Bank per Marzook's instructions; and stated that he had helped to train certain Hamas recruits. 340 F.Supp.2d at 920, 921; *id.* at 918.

**7.** The district court's articulation of what the Boims were obligated to prove appears to conflate two distinct theories of liability that

spiracy principles, Salah could be liable for acts committed in furtherance of a conspiracy even after his withdrawal, providing he had not repudiated the goals of the conspiracy. *Id.* Moreover, even if the Boims were unable to show that Salah had given material support to Hamas, under conspiracy principles he could still be liable for David Boim's murder so long as it was a reasonably foreseeable result of "the conspiracy that was Hamas." *Id.* at 924.

The Boims did not seek summary judgment against QLI and the district court denied QLI's motion for summary judgment, which left QLI as the sole defendant facing trial on the subject of liability. Trial had previously been set for December 1, 2004, a date which was just three weeks off when the district court ruled on the motions for summary judgment. Following the summary judgment ruling, QLI moved to continue the trial date. Magistrate Judge Keys orally denied that request on or about November 24, 2004. QLI's counsel immediately asked the court to allow an interlocutory appeal, and anticipating correctly that the district court would deny that request, R. 657, counsel also sought leave to withdraw from representing QLI on the ground that he believed he could not competently represent QLI at a trial beginning on December 1, a request that the court likewise denied, R. 658.

One week in advance of trial, the district court issued an opinion resolving certain motions in limine and other evidentiary matters. *Sua sponte* and without prior notice, the court noted that it had already determined on summary judgment vis-à-vis the other defendants that Hamas was responsible for David Boim's murder and signaled that this determination would limit what evidence the Boims would need to present in order to establish QLI's liability. R. 659 at 9; *see also* R. 688, Mem. Op. at 9. Subsequently, in its opening instructions to the jury, the court would state that "[t]he terrorist group Hamas was responsible for the murder." R. 814-1 at 107. When he addressed QLI's liability in both his opening statement and closing argument to the jury, the Boims' counsel would expressly rely on that finding in laying out the Boims' case against QLI. *Id.* at 126 ("As the Judge has already told you, he has concluded ... that Hamas is responsible for David's murder."); R. 814-4 at 503 ("The Court has already ruled that the international terrorist organization Hamas killed David Boim.").

The trial began with jury selection as scheduled on December 1. On that date, QLI filed a notice of attendance but nonparticipation in the trial. R. 663. The notice indicated that QLI had decided not to participate in the trial because although it had a meritorious defense to the complaint, QLI did not believe its counsel could effectively defend QLI without additional time and its counsel was unwilling to present an ineffective defense. In a colloquy with QLI's corporate secretary prior to start of trial, Magistrate Judge Keys confirmed that it was QLI's wish not to participate in the trial. R. 814-2 at 158–164. The trial thereafter commenced, and although QLI's representative and counsel were present, its counsel did not partici-

---

we discussed in *Boim I:* providing material support to terrorist activity or to a terrorist organization, *see* 18 U.S.C. §§ 2339A and 2339B, 340 F.Supp.2d at 1012–16, and aiding or abetting an act of international terrorism, *id.* at 1016–1021 & 1023. Certainly, one could aid and abet a terrorist act by providing material support to those who commit the act, but the type of assistance an aider and abettor might provide is not limited to assistance that qualifies as material support for purposes of sections 2339A or 2339B. *See* § 2339A(b)(1) (defining "material support").

pate in jury selection, did not give an opening statement, did not cross-examine plaintiff's witnesses or present witnesses for QLI, and did not make closing argument. The case was submitted to the jury on December 7, and the jury returned its verdict the following day.

The jury found in favor of the Boims and against QLI on liability. It awarded damages of $52 million against all four defendants (QLI, HLF, IAP/AMS, and Salah). Those damages were subsequently trebled as provided in section 2333(a).

## II.

### Holy Land Foundation

A. Collateral Estoppel Based on DC Litigation Over IEEPA Designation

In litigation challenging the government's 2001 decision to name HLF a specially designated terrorist organization, the District of Columbia Circuit found that HLF had funded the terrorist activities of Hamas. As we have noted, the district court in this case gave that finding collateral estoppel effect and relied on that finding to hold HLF liable to the Boims on summary judgment. HLF contends that it was inappropriate for the court to grant the D.C. Circuit's finding collateral estoppel effect in the instant litigation. For the reasons that follow, we agree.

1. Proceedings in the District of Columbia Circuit

a. *Summary of IEEPA designation*

The International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* ("IEEPA"), empowers the President of the United States to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign

policy, or economy of the United States." § 1701(a). Once the President declares such an emergency, he may "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." This statutory provision "is designed to give the President means to control assets that could be used by enemy aliens." *Global Relief Found. v. O'Neill,* 315 F.3d 748, 753 (7th Cir.2002).

On January 23, 1995, President Clinton issued Executive Order 12947 declaring such an emergency, finding that "grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process" amounted to an "unusual and extraordinary threat to the national security, foreign policy, and economy of the United States[.]" § 1702(a)(1)(B). This order froze all assets of those terrorist organizations and persons, referred to in regulatory parlance as "Specially Designated Terrorists" (SDTs), identified in the order. Hamas, commonly known as the Islamic Resistance Movement, is among those designated organizations. The order also authorized the Secretary of the Treasury to designate additional SDTs found to be "owned or controlled by, or to act for or on behalf of" Hamas or any other entity designated in the order.

On September 23, 2001, following the September 11 terrorist attacks by al-Qaeda, President Bush issued Executive Order 13224 declaring a national emergency arising from "grave acts of terrorism ... and

the continuing and immediate threat of further attacks on United States nationals or the United States." That order blocked all property or interests in property held by designated terrorist organizations who are referred to as "specially designated global terrorists" (SDGTs). Hamas subsequently was designated as one of the SDGTs subject to that order. The order further authorizes the designation of additional SDGTs whose assets are subject to blocking because they are "owned or controlled by" or "act for or on behalf of" SDGTs or "assist in, sponsor, or provide ... support for," or are "otherwise associated" with them.

On November 5, 2001, Dale L. Watson, the Assistant Director of the FBI's Counterterrorism Division, issued an "action memorandum" (hereinafter, the "Watson Memorandum") to the director of the Treasury Department's OFAC recommending that HLF be designated an SDT based on its ties to and activities on behalf of Hamas.

> FBI investigations of HAMAS activities in the United States have revealed that [HLF] is the primary fundraising entity for HAMAS and that a significant portion of the funds raised by [HLF] are clearly being used by the HAMAS organization. The information provided in this document confirms that [HLF] is acting for or on behalf of HAMAS. Further, senior members of [HLF] support HAMAS ideology and activities. These HAMAS activities interfere with the Middle East peace process and pose a threat to the national security, foreign policy, or economy of the United States. As such, [HLF] should be considered by OFAC for SDT designation as a HAMAS entity, subject to the prohibitions of the IEEPA statute.

R. 265–1 Ex. 12 at 49.

The Director of the OFAC accepted Watson's recommendation, and on Decem-

ber 4, 2001, the Secretary of Treasury issued a finding that HLF "acts for or on behalf of" Hamas. Pursuant to that finding, and without prior notice to HLF, HLF was designated an SDT under Executive Order 12947 and an SDGT under Executive Order 13224. OFAC in turn issued a "Blocking Notice" freezing all of HLF's funds, accounts, and real property in the United States. Pursuant to that notice, all transactions involving property in which HLF holds an interest are prohibited without specific authorization from the OFAC.

On March 8, 2002, HLF filed suit in the United States District Court for the District of Columbia challenging its designation as an SDT and SDGT and the blocking of its assets. The following month, the Treasury Department notified HLF and the district court that it was reopening the administrative record underlying the designation and considering whether to redesignate HLF as an SDGT based on additional evidence linking HLF to Hamas. HLF was given thirty-one days to respond to this notice. HLF did respond and in support of its response submitted evidence in support of the contention that it was not involved with Hamas.

On May 31, 2002, HLF was redesignated as both an SDT and SDGT based on the evidentiary record underlying the first designation in December 2001 *plus* additional classified and unclassified information and a second evidentiary memorandum from the FBI to the OFAC.

b. *HLF's lawsuit challenging blocking order*

HLF's suit in the District Court for the District of Columbia contended that the designation and blocking order was contrary to the Administrative Procedure Act ("APA"), the Due Process and Takings Clauses of the Fifth Amendment, the

Fourth Amendment, HLF's First Amendment rights to freedom of speech and association, and the Religious Freedom Restoration Act. Ultimately, the district court granted summary judgment in favor of the government on the APA claim and dismissed all but one of the remaining claims set forth in HLF's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *Holy Land Found. for Relief & Dev. v. Ashcroft,* 219 F.Supp.2d 57 (D.D.C.2002).

Upon review confined to the administrative record, the district court held that the OFAC's action in designating HLF an SDT and SDGT and blocking HLF's assets was not arbitrary or capricious and was therefore consistent with the APA. *See* 5 U.S.C. § 706(2)(A). The court observed that the administrative record provided substantial support for the OFAC's determination that HLF acts for or on behalf of Hamas. Specifically, the record revealed that: (a) HLF had financial connections to Hamas dating back to 1988 (including raising funds for and providing financial support to Hamas, and financing U.S. fundraising trips by Hamas leaders); (b) HLF leaders had been actively involved in various meetings with Hamas leaders (including a three-day meeting in 1993 in Philadelphia, monitored and recorded by the FBI, which five senior Hamas officials and three senior HLF leaders attended, and a 1994 meeting in Oxford, Mississippi between a co-founder of HLF and a senior Hamas leader concerning a fundraising dispute); (c) HLF had funded charitable organizations controlled by Hamas (specifically, between 1992 and 1999, HLF had contributed approximately $1.4 million to eight Hamas-controlled charity or "zakat" committees, and between 1992 and 2001, HLF had given approximately $5 million to seven other Hamas-controlled charitable organizations, including a hospital in Gaza); (d) HLF had provided financial support to family members of Hamas

"martyrs" (a term the court construed as referring to persons who were killed carrying out suicide bombings or other terrorist acts on behalf of Hamas) and prisoners, and, indeed, among needy families eligible for its support, HLF particularly sought out applications from the families of "martyrs" and may have favored them with higher payments; (e) HLF's Jerusalem office had acted on behalf of Hamas and was shut down by the Israeli government in 1995 after the Israelis concluded that HLF was channeling funds to the families of Hamas activists; and following his arrest in 1997, the former head of that office revealed that although HLF provided aid to the needy, it also channeled some money to Hamas; and (f) eight unidentified FBI informants had reported instances in which HLF leaders stated that HLF funds and supports Hamas. 219 F.Supp.2d at 69–73. The district court concluded that this evidence gave the OFAC a rational basis for concluding that HLF acts for or on behalf of Hamas. *Id.* at 74. The court observed that its role was not to second-guess the OFAC on its credibility determinations or on issues implicating the foreign policy expertise of the Executive Branch; the court's sole task was to determine whether the agency had a reasonable basis for its action. *Id.* at 75.

With one immaterial exception (relating to one aspect of HLF's Fourth Amendment claim), the court concluded that HLF's complaint otherwise failed to state a claim on which relief could be granted. Among the claims dismissed was a First Amendment challenge which alleged that the government, by blocking HLF's assets and preventing it from making humanitarian contributions, was violating HLF's rights of free speech and free association. It is the resolution of this First Amendment challenge that underlies the collater-

al estoppel determination made by the district court in the instant case.

The D.C. district court concluded that the blocking order did not unduly interfere with HLF's freedom of association. The court first noted that neither the blocking order, the two Executive Orders pursuant to which HLF had been designated, nor the IEEPA precluded HLF from holding membership in Hamas or endorsing its views, so HLF's rights of association were not implicated. 219 F.Supp.2d at 81. All that HLF was forbidden from doing was giving money to Hamas, "'and there is no constitutional right to facilitate terrorism.'" *Id.* (quoting *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1133 (9th Cir.2000)). The court rejected HLF's contention that the First Amendment required proof that HLF specifically intended to further Hamas's illegal activities before its assets could be frozen. That requirement, set forth in *NAACP v. Claiborne Hardware Co., supra*, 458 U.S. at 920, 102 S.Ct. at 3429, was inapposite, as the government had not deemed HLF guilty of wrongdoing based simply on its association with Hamas. 219 F.Supp.2d at 81. The court held that, in any case, it would be unworkable to engraft such an intent requirement on the government's ability to designate and block the assets of individuals and organizations that act on behalf of known terrorist organizations, as an organization like HLF, regardless of its intent, cannot control whether the recipient of its aid will use that support in furtherance of terrorist activities. *Id.* (*citing Humanitarian Law Project*, 205 F.3d at 1133).

The court further held that the blocking order did not violate HLF's freedom of speech. To the extent the blocking order interfered with HLF's free speech rights by preventing it from making humanitarian contributions, the intrusion was justified by the government's compelling interest in battling terrorism. The court noted that humanitarian contributions have both speech and non-speech elements; for that reason, the blocking order was subject to intermediate scrutiny. *Id.* at 81–82 n. 37. Applying the four-part test set forth in *United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968), the court concluded that the governmental interest in regulating the non-speech aspect of contributions was sufficiently important to justify the incidental limitations on HLF's First Amendment rights. The court noted that Presidents Clinton and Bush had the power under the IEEPA to issue the Executive Orders declaring national emergencies, and both the IEEPA and the two Executive Orders authorized the designation and blocking order against HLF. The Executive Orders and the blocking order furthered the important and substantial governmental interest in combating terrorism by undermining its financial base. Moreover, that governmental interest in combating terrorism was unrelated to suppressing speech. Although blocking the assets of a designated organization resulted in an incidental restriction on the organization's freedom of speech, that restriction was no greater than necessary to further the government's interest. "Money is fungible," the court observed, and the government has no more narrow means of ensuring that contributions made to a terrorist organization for legitimate humanitarian purposes are in fact used for those purposes. *Id.* at 82; *see also id.* at 71 n. 20 (noting that the "charitable component" of Hamas "is an effective way for Hamas to maintain its influence with the public, indoctrinate children and recruit suicide bombers" and consequently, one cannot draw a clear line between Hamas's legitimate and illegitimate activities). For these reasons, the court held that the

blocking order did not impermissibly restrict HLF's First Amendment rights.

On appeal, the District of Columbia Circuit affirmed the entry of summary judgment against HLF on the APA claim. The appellate court held that the actions of the Treasury Department's OFAC were properly reviewed pursuant to the arbitrary and capricious standard, and the decision to designate HLF an SDT and SDGT was "based on ample evidence in a massive administrative record." 333 F.3d at 162. That a significant portion of that evidence amounted to hearsay was not problematic: "it is clear that the government may decide to designate an agency based on a broad range of evidence, including intelligence data and hearsay declarations." *Id.* (citing *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 196 (D.C.Cir.2001)).

With respect to HLF's First Amendment claims, the court found that the district court had erred in disposing of these claims pursuant to Rule 12(b)(6). The underlying premise of the district court's rationale for dismissing these claims was that there is no constitutional right to facilitate terrorism. However, HLF's amended complaint alleged that HLF had no knowing affiliation with Hamas or any other terrorist organization and did not fund terrorist activity. So in order to reach the outcome it did, the district court first had to find, contrary to the allegations of the complaint, that HLF in fact did fund terrorism. The district court could not make such a finding without either applying an improperly heightened pleading standard or expanding the scope of Rule 12(b)(6) review. The district court apparently had considered the evidence in the administrative record in disposing of the First Amendment claims, but it did so without notifying the parties that it was converting the motion to dismiss into a motion for summary judgment by looking to matters outside of the complaint and without granting HLF an opportunity to present additional material pertinent to a summary judgment motion as contemplated by Rule 12(b). In this respect, the court had abused its discretion. 333 F.3d at 164–65.

Despite the procedural irregularity, the court concluded that HLF had not been prejudiced by the denial of an opportunity to present evidence. Echoing the district court, the appellate court observed that there is no constitutional right to fund terrorism. *Id.* The court had before it the full administrative record, which included both the classified and unclassified evidence that the OFAC had taken into consideration in designating and re-designating HLF an SDT and SDGT. The court was satisfied that the record not only supported the notion that HLF funded terrorism, but ruled out the possibility that HLF could prove otherwise:

> The ample record evidence (particularly taking into account the classified information presented to the court *in camera*) establishing HLF's role in the funding of Hamas and of its terrorist activities is incontrovertible. While not in accordance with proper procedures, HLF has had every opportunity to come forward with some showing that the evidence is false or even that its ties to Hamas had been severed. HLF's presentations at the administrative stage did not reach this goal, even when HLF was given an additional thirty-one days to respond to its redesignation and to the new evidence in April of 2002. Even following the district court's judgment, while HLF attempted to supplement the record on appeal, the supplementary material could not have defeated the proposition established by the record evidence that Holy Land was a funder of the terrorist organization Hamas. Per-

haps the supplemental evidence offered, while properly rejected from the administrative review claim, should have been admitted for the unannounced summary judgment proceeding we now review. But it would have made no difference. *Id.* at 165–66. The Court clarified that in the ordinary case, it would not necessarily deem harmless a district court's decision to dismiss a case based on evidence outside of the pleadings simply because the losing party was unable to show what contrary evidence it would have produced had it been given the opportunity to do so; for in a general case, only the opportunity for discovery (which HLF had not been given) might have enabled the party to produce such evidence. *Id.* at 166.

However, this is not a general case. This is a specific case involving sensitive issues of national security and foreign policy. In addition to the classified evidence that we have reviewed, all evidence from the government that is unclassified and otherwise discoverable is in the record before us, as is the evidence HLF produced in an effort to create a genuine factual dispute. Despite the district court's failure to follow the proper procedures, HLF had every opportunity and incentive to produce the evidence sufficient to rebut the ample evidence supporting the necessary conclusion that it was a funder of Hamas but could not do so.... Again, we hold as other courts have that there is no First Amendment right nor any other constitutional right to support terrorists, and that the record supports no conclusion that the designation or blocking violated any constitutional right of the HLF. *See, e.g., Humanitarian Law Project,* 205 F.3d at 1133.

333 F.3d at 166.

It was the District of Columbia Circuit's resolution of HLF's First Amendment challenges to the blocking order that formed the springboard for the district court's invocation of collateral estoppel here. In particular, the district court relied upon the D.C. Circuit's finding that the "ample record evidence" before that court, including the classified evidence submitted *in camera,* proved "incontrovertibl[y]" that HLF funded Hamas and its terrorist activities. 340 F.Supp.2d at 903 (quoting *Ashcroft,* 333 F.3d at 165–66); *see supra* at 717). That language led the district court to conclude that HLF's provision of material support to Hamas was actually litigated in the prior action and was essential to the D.C. Circuit's decision to sustain the dismissal of HLF's First Amendment claims. *Id.* The district court was also satisfied that HLF had been given a full and fair opportunity to litigate the subject of its financial support of Hamas in the prior litigation. It was immaterial that the litigation in the District of Columbia entailed judicial review of an administrative determination. *Id.* at 904. Each of the arguments that HLF had raised in opposition to the Boims' attempt to impose civil liability on the organization had been raised and rejected in resolving HLF's contention that the designation and blocking order impermissibly infringed on its First Amendment rights. *Id.* HLF offered the court no insight as to what evidence might have been lacking in the record before the District and Circuit Courts in the District of Columbia. *Id.* at 904–05. HLF had of course been represented in that proceeding and had been given a full opportunity to present its position. *Id.* at 905.

The district court acknowledged that the D.C. Circuit, in deeming HLF's role in funding terrorism incontrovertible, had in part relied on classified evidence presented to that court *in camera. Id.* No one other than the government and the D.C. Circuit

knew what that evidence was. *Id.* However, in the district court's view, the secrecy shrouding that evidence "d[id] not vitiate the potential conclusive effect of the D.C. Circuit's judgment." *Id.* There was nothing to suggest that either the trial or the appellate courts in the prior litigation had acted as a rubber stamp in rejecting HLF's challenge to the designation and blocking order. *Id.* at 905–06.

### 2. Criteria for Non-mutual Offensive Collateral Estoppel

■ The doctrine of collateral estoppel is employed under appropriate circumstances to prevent a party from re-litigating an issue that has already been fully litigated in another action. *E.g., United States v. Mendoza,* 464 U.S. 154, 158, 104 S.Ct. 568, 571, 78 L.Ed.2d 379 (1984). Here, the Boims invoked collateral estoppel offensively, relying on the D.C. Circuit's finding that HLF funded Hamas's terrorist activities as conclusive for purposes of their own case against HLF, and non-mutually, in the sense that the Boims were not a party to the litigation in the D.C. Circuit. *See id.* at 159 n. 4, 104 S.Ct. at 571 n. 4; *Harrell v. U.S. Postal Serv.,* 445 F.3d 913, 921 (7th Cir.), *cert. denied,* ── U.S. ──, 127 S.Ct. 845, 166 L.Ed.2d 665 (2006). There are four principal criteria that must be met to support the application of non-mutual offensive collateral estoppel: (1) the issue sought to be precluded from further litigation must be the same issue that was decided in the prior action; (2) that issue must have actually been litigated in the prior action; (3) the determination of that issue must have been essential to the final judgment in the prior action; and (4) the party against whom estoppel is invoked must have been fully represented in the prior action. *E.g., Chicago Truck Drivers, Helpers & Warehouse Union (Indep.) Pension Fund v. Century Motor Freight, Inc.,* 125 F.3d 526,

530 (7th Cir.1997). Collateral estoppel is, however, an equitable doctrine. *Evans v. Katalinic,* 445 F.3d 953, 956 (7th Cir.2006); *Jones v. City of Alton, Ill.,* 757 F.2d 878, 885 (7th Cir.1985). Therefore, even if the criteria are satisfied, it remains within the court's discretion not to allow offensive use of the doctrine when the court is convinced that it would be unfair to preclude a party from re-litigating an issue. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 331, 99 S.Ct. 645, 651–52, 58 L.Ed.2d 552 (1979) (district courts enjoy broad discretion whether to invoke offensive collateral estoppel and should not do so where it would be unfair); *see also Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1023 (7th Cir.2006) (applying Illinois law) (even if the technical requirements for offensive collateral estoppel are met, the doctrine must not be applied unless it is clear that no unfairness would result to estopped party); *Ross–Berger Cos. v. Equitable Life Assur. Soc. of U.S.,* 872 F.2d 1331, 1338 (7th Cir.1989) (applying Illinois law); *Jones,* 757 F.2d at 885. The doctrine should not be invoked when there is reason to doubt the quality, extensiveness, or fairness of the procedures followed in the prior litigation or when the party against whom estoppel is sought otherwise did not have the benefit of a full and fair opportunity to litigate the issue in the prior proceeding. *Kremer v. Chem. Constr. Corp.,* 456 U.S. 461, 480–81, 102 S.Ct. 1883, 1897, 72 L.Ed.2d 262 (1982) (collecting cases).

### 3. Analysis

■ Applying these criteria, we come to a different conclusion than the district court did as to the propriety of invoking the collateral estoppel doctrine. Although we review a district court's decision to apply collateral estoppel for abuse of discretion, *Harrell v. U.S. Postal Serv.,* 445 F.3d at 921 (citing *Parklane Hosiery Co.,*

439 U.S. at 331, 99 S.Ct. at 651), the question of whether the issues presented in the two suits are identical is a legal question as to which our review is *de novo*, *Adair v. Sherman*, 230 F.3d 890, 893 (7th Cir.2000). We conclude that the question presented in the *Ashcroft* litigation in the District of Columbia Circuit was not the same as the question posed in the Boims' case against HLF. Consequently, the threshold criterion for offensive non-mutual collateral estoppel cannot be satisfied, and the district court necessarily abused its discretion in collaterally estopping HLF from contesting the proposition that it knowingly and intentionally provided material support to Hamas by funding its terrorist activities.

The requirement that the issue resolved in the prior action must be the same as the one presented in the instant proceeding is an exacting criterion. Similarity does not suffice; the issue in the current case must be the precise and identical issue that was decided in the prior action. *Am. Nat'l Bank & Trust Co. of Chicago v. Regional Transp. Auth.*, 125 F.3d 420, 430 (7th Cir. 1997) (applying Illinois law); *see also Parklane Hosiery Co.*, 439 U.S. at.326, 99 S.Ct. at 649; *Smith v. SEC*, 129 F.3d 356, 362 (6th Cir.1997) (en banc); *Prymer v. Ogden*, 29 F.3d 1208, 1212 (7th Cir.1994); *Crot v. Byrne*, 957 F.2d 394, 396 (7th Cir. 1992); *Levesque v. Brennan*, 864 F.2d 515, 519 (7th Cir.1988).

For purposes of context, we point out that the first and principal issue in the District of Columbia litigation was the propriety of the Treasury Department's decision to designate HLF an SDT and SDGT and to block its assets. As is typical in cases involving administrative decision-making, HLF's challenge to the designation did not trigger a *de novo* examination of the evidence before the Treasury Department. Rather, both the district and appellate courts confined themselves to determining whether the Treasury Department's decision was arbitrary and capricious and whether the designation and blocking order was inconsistent with HLF's statutory or constitutional rights. It was for that reason that the bulk of the litigation was resolved without discovery and without the usual kinds of factfinding procedures that are normally followed in civil litigation involving disputed facts. In this fundamental respect, the setting of the District of Columbia litigation was different from the instant case. The former entailed deferential review of an administrative determination, whereas the Boim's complaint in this case calls for straight-on determination of whether HLF funded or otherwise supported Hamas's terrorist activities and, if so, whether there was a causal relationship between that support and David Boim's murder.

Against that backdrop, the sole potential for substantive overlap between the District of Columbia litigation and the instant case lies in the First Amendment challenges that HLF raised in the former litigation, as the parties and the district court have recognized. Only as to those claims was there a *de novo* judicial assessment of HLF's links to terrorism, and that assessment took place at the appellate level. Recall that the district court in *Ashcroft* had dismissed these claims on the pleadings, reasoning that there is no constitutional right to provide funding to a terrorist organization and thereby facilitate terrorism. 219 F.Supp.2d at 81, 82. Although the D.C. Circuit agreed with this principle, it held that in order to dispose of HLF's First Amendment challenge on this basis, it was necessary for the court to find that HLF actually does fund Hamas's terrorist activities. The appellate court then proceeded to make that finding. Looking to the record evidence, and in particular the classified evidence, un-

derlying the Treasury Department's designation decision, the D.C. Circuit found it "incontrovertible" that HLF funded terrorism by funding Hamas. 333 F.3d at 165.

The D.C. Circuit's finding that HLF funded Hamas's terrorist activities was not, however, a finding that HLF engaged in an act of international terrorism within the meaning of section 2333 or that it aided and abetted such an act. In particular, the D.C. Circuit did not mention, let alone embrace, our holding in *Boim I* that funding *simpliciter* of an organization that engages in terrorism would be inadequate to establish section 2333 liability but rather that the financial support must be given with knowledge and intent to further terrorism. 291 F.3d at 1011–12, 1021–24. We took our cue on that point from the Supreme Court's decision in *Claiborne Hardware*, which conditions the civil liability of an organization for the violent acts of one of its members on proof that the organization had the specific intent to further the aims of the wrongdoer. *See* 458 U.S. at 919–20, 102 S.Ct. at 3428–29. Imposing liability solely on the basis of an organization's association with a wrongdoer would interfere with the organization's First Amendment freedom of association, the Court concluded, *id.* at 920, 102 S.Ct. at 3429. The D.C. Circuit's decision in *Ashcroft* did not mention *Claiborne Hardware*, either. Notably, however, the district court's decision in *Ashcroft* had discussed *Claiborne Hardware*, and it had expressly rejected HLF's reliance on that precedent as a basis for challenging the

designation and blocking orders. 219 F.Supp.2d at 80–81. The lower court reasoned that the blocking order did not impose "guilt by association" in the way that the tort judgment against the NAACP at issue in *Claiborne Hardware* had; the order simply acted to prevent HLF from providing further funding to a terrorist organization, which it had no constitutional right to do in any event. *Id.* "Because the Government in this case has not imposed guilt by association, the *Claiborne Hardware* specific intent requirement is not applicable." *Id.* at 81. As we have noted, the district court added that it might be counterproductive to condition the issuance of a blocking order on proof that the donor knows and intends that its contributions be used in furtherance of terrorism:

> [I]mposing a "specific intent" requirement on the Government's authority to issue blocking orders would substantially undermine the purpose of the economic sanctions programs. Regardless of HLF's intent, it can not effectively control whether support given to Hamas is used to promote that organization's unlawful activities. *Humanitarian Law Project*, 205 F.3d at 1133 (First Amendment does not require the government to demonstrate a specific intent to aid an organization's illegal aims because "[m]aterial support given to a terrorist organization can be used to promote the organization's unlawful activities, regardless of donor intent").

219 F.Supp.2d at 81.[8] The district court's rationale in this regard suggests rather

---

8. This court employed similar reasoning in *Boim I* when it rejected a First Amendment challenge aimed specifically at section 2339B as a predicate to civil liability under section 2333. As noted above, we held that providing material support to a foreign terrorist organization, conduct that is rendered a crime by section 2339B, could serve as the predicate

for a civil suit under section 2333. 291 F.3d at 1014–15; *see supra* at 715 & n. 4. Section 2339B(a) on its face does not require proof that the provider of material support intended for that support to further the terrorist activities of the organization; the provider need only have knowledge that the organization has been designated a foreign terrorist organ-

ization. *See Humanitarian Law Project v. Mukasey*, 509 F.3d 1122, 1125 (9th Cir.2007); *United States v. Hammoud*, 381 F.3d 316, 328 (4th Cir.2004) (en banc), *vacated on other grounds*, 543 U.S. 1097, 125 S.Ct. 1051, 160 L.Ed.2d 997 (2005), *reinstated in relevant part on remand*, 405 F.3d 1034 (4th Cir.2005) (en banc); *but see United States v. Al–Arian*, 329 F.Supp.2d 1294 (M.D.Fla.2004) (construing section 2339B to require that provider of material support have specific intent to further terrorist organization's illegal activities in order to avoid constitutional difficulty of imposing guilt by association). The absence of an intent requirement in section 2339B prompted the defendants to argue in *Boim I* that insofar as the Boims were attempting to hold them civilly liable on the theory that they had violated section 2339B by providing material support to Hamas, the imposition of civil liability would interfere with the defendants' First Amendment rights. The defendants contended that the First Amendment protected their right to give money to Hamas and its affiliates so long as their intent was to support the charitable work of those groups rather than terrorist activities. Thus, in the defendants' view, the government could not proscribe donations made to Hamas without the intent to further its terrorist activities, nor could the plaintiffs seek to impose civil liability for a violation of section 2339B without proof of such an intent.

We rejected this argument. We emphasized at the outset that the validity of section 2339B was not before us. The defendants were not being prosecuted for a violation of section 2339B; rather, the criminal statute was only relevant insofar as the Boims were seeking to impose civil liability on the basis of conduct that is proscribed by section 2339B. 291 F.3d at 1025. With that qualification in mind, we proceeded to say that the First Amendment does not prevent the government from outlawing the donation of money and other support to foreign terrorist organizations regardless of the intent of the donor. The Supreme Court had concluded in *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 638, 46 L.Ed.2d 659 (1976), that impingement on the rights of association and speech may be justified if the government shows that a sufficiently important interest is at stake and employs means to further that interest which are closely enough tailored so as to avoid unnecessary curtailment of associational liberties. We reasoned that the government's interest in preventing terrorism is "paramount." 291

F.3d at 1027 (citing *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1135 (9th Cir. 2000)). Consistent with that vital interest, the government could permissibly try to cut off the provision of money and other support to terrorist organizations by making such donations illegal, even if they are made with innocent intent. For the same reason, donors could be held civilly liable for the harm resulting from such proscribed donations. "A section 2333 suit founded on conduct violating section 2339B does not punish membership in a designated terrorist organization, or penalize the expression of views held by these organizations. Rather, such a suit is aimed at prohibiting the funding of violent acts that these organizations wish to carry out." *Id.* (citing *Humanitarian Law Project*, 205 F.3d at 1135). We further concluded that section 2333 liability premised on conduct violating section 2339B is closely enough tailored to survive First Amendment scrutiny. It is not practical to proscribe only donations made with intent to further such illegal activities; terrorist organizations are able to use funds for illegal activities regardless of intent of the donor. Consequently, *all* donations to terrorist organizations may be proscribed. We pointed out that in order to be designated a foreign terrorist organization, that organization must engage in terrorist activity that threatens the security of the U.S. or its nationals. These requirements are stringent. In short, Congress did not purport to criminalize membership in a terrorist organization or espousing the organization's views; rather, it only proscribed funding a group that the government had officially designated a foreign terrorist organization. Liability was thus sufficiently circumscribed to serve the government's interest in ceasing the flow of money to terrorist organizations without unduly interfering with associational rights. *Id.* at 1027.

We should point out that in this case, as a practical matter, civil liability under section 2333 could not be premised on a violation of section 2339B. David Boim was killed in 1996. Hamas was not designated a foreign terrorist organization pursuant to 8 U.S.C. § 1189(a) until the following year. 291 F.3d at 1016. Thus, donations of money and other support to Hamas made before David Boim's murder, because they pre-dated Hamas's designation as a foreign terrorist organization, did not violate the criminal proscription of section 2339B. To that extent, the premise of this particular First Amendment challenge

strongly that the question presented in *Ashcroft* as to HLF's support of Hamas is not identical to the issue presented here. The D.C. Circuit's silence on this point is in turn significant: If the appellate court meant to overrule the district court and require proof that HLF had the specific intent to further Hamas's terrorist activities, one would have expected the court to say so, particularly when that court was expressly urged to impose an intent requirement. *See* 2003 WL 25586053, at *28–32 (appellate brief of HLF).

One might be tempted to say that when the D.C. Circuit found that HLF funded Hamas, it necessarily found that HLF did so with knowledge that Hamas perpetrates terrorist acts and with the intent to support such acts. After all, Hamas's role in terrorism has never been a secret, and the *Ashcroft* district court's summary of the evidence underlying the blocking order indicates that HLF had longstanding and extensive ties to Hamas at multiple levels. *See supra* at 722; 219 F.Supp.2d at 69–73.

However, a further review and comparison of the district and appellate court opinions in *Ashcroft* reveals the difficulty of reading into the D.C. Circuit's decision the findings of knowledge and intent needed to impose civil liability under section 2333. The evidence that the district court relied upon to sustain the Treasury Department's determination that HLF had acted for or on behalf of Hamas was a mixed bag in this respect. Some of that evidence suggested that HLF not only was aware of Hamas's terrorist activities but meant to aid such activities. The district court noted, for example, that HLF particularly sought to provide financial aid to the families of Hamas "martyrs"—*i.e.*, suicide bombers and others who die carrying out terrorist attacks. 219 F.Supp.2d at 71–72. One could readily infer from such evidence that HLF was using the guise of charity to further terrorism. However, other evidence cited by the district court included support of Hamas's humanitarian activities that potentially would be protected under *Boim I.* For example, the court noted that HLF had provided millions of dollars in funding to charitable organizations (including a hospital in Gaza) controlled by Hamas. *Id.* at 70–71. Did HLF know that these charities were controlled by Hamas? The district court's opinion does not say. Did HLF intend that the money given to these charities be funneled to Hamas's terrorist arm? The opinion does not say. The district judge did observe that Hamas's charitable activities helped cultivate public support for Hamas and to recruit terrorists. *Id.* at 71 n. 20. But nowhere in the district court's decision is there a finding that HLF funded Hamas charities with this understanding (*i.e.*, knowledge) and purpose. On the contrary, the district court could not have been more clear in saying that proof of such an intent was *not* necessary, even in order to overcome HLF's First Amendment objections to the blocking order. *Id.* at 81. In that court's view, any support that HLF gave to Hamas and its affiliates, even support that HLF intended be used for humanitarian purposes, supplied justification for the

was hypothetical, and our discussion of the challenge was unnecessary to our holdings in *Boim I.*

Section 2339B aside, a defendant's provision of material support to Hamas nonetheless might still amount to an act of international terrorism for purposes of section 2333 and therefore support civil liability to the

Boims in this case. But without the crutch of section 2339B to lean on, the plaintiffs would have to meet the other elements discussed elsewhere in *Boim I,* including in particular a showing that the defendant provided material support to Hamas *with the intent* to further the terrorist activities of the organization. *See Boim I,* 291 F.3d at 1014–15.

blocking order. For its part, the D.C. Circuit did not even discuss the nature of the evidence that it relied upon in concluding that HLF funded Hamas. All we know is that the evidence before the appellate court, including in particular the classified evidence that the government tendered to that court *in camera,* convinced the court that HLF funded Hamas and therefore funded terrorism. Because the court did not purport to adopt any requirement of knowledge and intent, we cannot know whether the court, in determining that HLF funded terrorism, relied on evidence showing that HLF knowingly and deliberately funded terrorist activities or rather relied, as the district court did in part, on evidence indicating that HLF provided more generalized support to Hamas, including financial support for Hamas-controlled charities. The court's opinion quite simply is opaque in that regard. In the absence of any discussion of knowledge and intent, the only plausible conclusion is that the D.C. Circuit did not believe that proof of HLF's knowledge and intent in funding Hamas was necessary; so far as it appears, funding *simpliciter* was enough in that court's view to overcome HLF's First Amendment challenge to the blocking order. This, of course, would not suffice to meet the standard for civil liability that we articulated in *Boim I.*

Therefore, although there undoubtedly is some factual overlap between the *Ashcroft* litigation and this case, the questions posed by the two suits are distinct. In *Ashcroft,* the issue posed by HLF's First Amendment challenge to the blocking order was whether it funded (directly or indirectly) Hamas's terrorist activities. Here, the question is whether HLF funded Hamas's terrorism knowingly—for example, realizing that it was giving money to charities controlled by Hamas, and that donations to such charities either would be diverted to terrorist ends or would free up

other funds for terrorist activity—and intentionally. Furthermore, the litigation in the D.C. Circuit directly concerned the government's ability to further the national security and conduct the foreign policy of the United States by stopping the flow of funds from organizations in the United States to terrorist entities abroad by freezing those assets before they can leave this country. Nothing that this court, the district judge, or a jury might say in this case would affect HLF's designation as an SDT or SDGT or confine the government's ability to rely on that designation in the future. The validity of the designation is not at stake here. Instead, this suit looks backward to determine whether HLF knowingly and intentionally supported Hamas's terrorist activities in a way that had some causal connection with David's murder, which occurred before HLF was even designated an SDT and SDGT. The subject matter of both suits (HLF's ties to Hamas) certainly is the same, and both suits have in common the goal of depriving terrorists of funds that they might use to commit further atrocities, but the means to that end, and the legal rules and procedures that govern them, differ in important respects.

Because the questions presented by the *Ashcroft* litigation and this suit are not identical, HLF cannot be collaterally estopped from litigating here whether it knowingly provided financial (or other) support to Hamas with the intent to further Hamas's terrorist activities. We need not consider whether any of the other prerequisites to offensive nonmutual collateral estoppel are satisfied, as all of them must be met in order for the doctrine to apply. Nonetheless, we conclude our analysis with a few observations about the fullness and fairness of the opportunity that HLF was given in the *Ashcroft* litigation to challenge the proposition that it

provided financing to Hamas and its terrorist activities.

First, HLF had only a limited opportunity in the *Ashcroft* litigation to contest its involvement with Hamas. As the *Ashcroft* opinion itself makes clear, the D.C. Circuit's conclusion that the links between HLF and Hamas were "incontrovertible" was based in particular on the classified evidence that the government had tendered to the court. 333 F.3d at 165. Because that evidence was submitted to the court *in camera* and *ex parte*, HLF never had the opportunity to see, let alone respond to, that evidence. (We ourselves have no idea what that evidence was or what specifically it revealed.) The D.C. Circuit recognized that in a more typical civil case, HLF likely would have been entitled to the opportunity that it was denied in *Ashcroft* to conduct discovery in order to assemble evidence that might have helped controvert the notion that it was funding terrorist activity. 333 F.3d at 166. But the court emphasized that *Ashcroft* was *not* a general case, but rather a case "involving sensitive issues of national security and foreign policy." *Id.* This case, by contrast, is a civil dispute between private litigants. The government is not a party to this action, and although its decisions to designate Hamas a terrorist organization and to block the assets of HLF based on its ties to Hamas are certainly relevant, we are not reviewing these decisions. Instead, we are focused on whether the Boims have shown that HLF took actions that contributed in some way to David's murder. The case is important, to be sure, not only to the parties, but also to others who have been injured by terrorism and to the individuals and organizations whose ties to terrorist organizations may

render them liable to those so injured. But, in contrast to *Ashcroft*, this case does not implicate national security or foreign policy concerns to a degree that would justify the circumvention of normal discovery and factfinding procedures. *See Parklane Hosiery*, 439 U.S. at 330–31 & n. 15, 99 S.Ct. at 651 & n. 15 (noting that it may be unfair to apply offensive collateral estoppel where second action affords defendant procedural opportunities that were unavailable in first action and that could readily produce a different result).

Second, the administrative determination at issue in *Ashcroft*—that HLF funds Hamas, and otherwise acts for and on behalf of Hamas—was not rendered by a neutral arbiter in an adversarial context but rather was an *ex parte* finding by a government agency. Although the *Ashcroft* litigation provided HLF with judicial review of that determination (and although HLF was given the opportunity to tender evidence to the OFAC contesting its affiliation with Hamas at the re-designation stage), it could not and did not grant HLF the opportunity that it was not afforded in the first instance—a fully adversarial hearing before a neutral and independent decisionmaker in which HLF would be permitted to confront the government's evidence, cross-examine its witnesses, and present testimony and other evidence of its own, and at the conclusion of which the decision-maker would make credibility assessments and other findings of fact.[9] True, the D.C. Circuit was convinced that HLF could not have controverted the government's evidence. 333 F.3d at 165–66. But that conclusion, like the OFAC's own administrative decision that HLF acted for or on behalf of Hamas, was based in significant part on classified evidence to which

9. HLF did have the opportunity, at the redesignation stage, to tender evidence to the OFAC. However, this was no substitute for an adversarial hearing at which witnesses could be examined and cross-examined.

HLF had no access and could not refute. We accept as the D.C. Circuit did that *ex parte* determinations based on a wholly or partially classified evidentiary record are appropriate for prophylactic measures that implicate matters of foreign policy and national security. *Id.* at 166. But we do not believe it appropriate to grant collateral estoppel effect to such determinations in a civil action between private parties, when foreign policy and national security concerns are not implicated to the degree they are in a lawsuit directly challenging governmental action.

Congress, when it enacted section 2333, no doubt meant to further particular national security and foreign policy interests by allowing those injured by acts of international terrorism to seek recompense in federal court. But it gave no sign that it meant to abandon the rules, rights, and procedures that have long governed civil litigation. Nothing in either the IEEPA or section 2333, for example, suggests that when a person or organization is found to act "for or on behalf of" a terrorist entity like Hamas based on its links with that entity, that finding shall be conclusive as to what that person or organization knew and intended when it affiliated with the terrorist. Absent further legislative action, it is not our place to deprive HLF of its right to contest the notion that it knowingly and intentionally supported Hamas's terrorist activities using the same tools and procedures that are made available to other civil litigants.

For all of these reasons, we conclude that the district erred in granting collateral estoppel effect to the D.C. Circuit's finding that HLF funded Hamas's terrorist activities. This alone requires the reversal of the district court's determination on summary judgment that HLF is liable for David Boim's murder. As we proceed to discuss below with respect to defendants

AMS and Salah, the district court mistakenly believed that an organization or individual that contributed money or other support to Hamas with the intent to support its terrorist activities could be liable to the Boims even in the absence of proof that the money or support given to Hamas was a cause in fact of David's death, so long as the murder of David was foreseeable to the donor individual or organization. This misunderstanding of our opinion in *Boim I* requires the reversal of the partial summary judgments deeming AMS and Salah liable to the Boims. It constitutes a second basis for reversing the entry of partial summary judgment against HLF, as there has been no finding that HLF's financial support of Hamas was a cause in fact of David Boim's death.

### III.

#### American Muslim Society

A. Summary judgment as to liability against AMS/IAP

1. District Court's analysis

■ Relying on *Boim I*, the district court stated that in order for AMS/IAP to be liable to the Boims, it must have (a) known about Hamas's illegal activities, (b) desired to help those activities succeed, and (c) engaged in some act of helping. 340 F.Supp.2d at 906. These are the elements we identified as necessary to render a defendant liable for aiding and abetting an act of international terrorism committed by or on behalf of Hamas. 291 F.3d at 1023. In the court's view, the undisputed facts established each of these three elements. We gave a brief overview of the court's findings earlier; now we recount them in a bit more detail.

As to the first element, AMS/IAP conceded that Hamas, in addition to using political means in furtherance of its goal of establishing an Islamic Palestinian state in

the Middle East, also employed violence, including acts of terrorism, in pursuit of that end. 340 F.Supp.2d at 906. AMS/IAP also conceded that Hamas was responsible for David Boim's murder. *Id.*

As to whether AMS/IAP had desired to aid Hamas and engaged in some act of assistance to Hamas, the court first rejected the notion that the IAP entities involved in the acts identified by the Boims were distinct from those named as defendants in this case. "[T]he record shows that at all times relevant to this action, there was a national organization serving as the Islamic Association for Palestine, and that IAP Texas and AMS either formally served as that organization, or were so intertwined and involved with that organization as to make any formal distinction meaningless. The defendants cannot now hide behind their ambiguous and amorphous corporate design." 340 F.Supp.2d at 908.[10]

The court proceeded to find abundant evidence that AMS/IAP desired to help Hamas's illegal activities succeed[11] and engaged in acts of assistance.

First, representatives of AMS/IAP had participated in the October 1993 Philadelphia meeting, which Hamas officials and representatives of HLS had also attended.

*See supra* at 722. The Watson memorandum noted that the recurring theme of the discussions captured by FBI surveillance was how entities affiliated with and working for Hamas should operate in light of the Oslo Accord, in which Yassir Arafat and Yitzhak Rabin had recognized—on behalf of Palestinians and Israelis—the right of each to exist and had committed to negotiate a permanent settlement and means to improved relations. According to Agent Watson, participants in the Philadelphia meeting universally condemned the Accord and discussed ways in which they might undermine the Accord and continue to support Hamas inside what they referred to as the "Occupied Territories." 340 F.Supp.2d at 908–09.

Second, IAP and AMS (and others within IAP umbrella) had contributed money to HLF and routinely and consistently encouraged others to donate to HLF and otherwise assisted HLF's fundraising. *Id.* at 910. HLF, of course, had links to Hamas that had led the OFAC to conclude that it acted "for or on behalf of" Hamas. Taken in the context of other evidence, "this is strong evidence that IAP was supporting Hamas, consistent with the FBI surveillance reports." *Id.*

Third, IAP and AMS had published and distributed pro-Hamas documents, includ-

---

**10.** AMS appeals the district court's finding on this point, but in view of our decision to reverse the summary judgment ruling against AMS on other grounds, we need not reach that issue here.

**11.** The district court at times referred to the need for proof that AMS desired to help Hamas's activities—as opposed to its *illegal* activities—succeed. *See, e.g.,* 340 F.Supp.2d at 908 ("Turning to the question of whether IAP and AMS desired to help Hamas' activities succeed, and in fact, engaged in some act of helping those activities succeed, . . . ."). Particularly where an organization like Hamas may engage in legal as well as illegal activities, one must take care to distinguish be-

tween the two and determine that the putative aider and abettor intended for the organization's illegal activities to succeed. *See Boim I*, 291 F.3d at 1023, 1024–25. If the evidence were to show that the humanitarian undertakings of an organization like Hamas in some way facilitate its terrorist activities, then those who support such humanitarian activities potentially could be held liable for supporting terrorism. However, consistent with the Supreme Court's decision in *Claiborne*, liability would be conditioned on proof that the individual knew and intended that his support for the humanitarian activities of the organization ultimately would also aid its terrorist activities. *Id.* at 1023.

ing the Hamas charter and, more recently, documents that included an editorial by Khalid Amyreh advocating "martyrdom" operations, meeting death with death, and killing Jews. IAP had paid Amyreh for his materials, but denied that it necessarily published the editorial because it shared his views. *Id.* at 910–11.

Fourth, when individuals with ties to Hamas were arrested and/or charged with supporting terrorism, IAP and AMS sought to rally public support for them. Following Salah's arrest in Israel, for example, IAP National and AMS held a number of events to garner public support for his release. When Abu Marzook, whom AMS/IAP official Rafeeq Jaber knew to be the head of Hamas's political bureau, was arrested in New York, IAP National published documents to garner support for him. Similarly, IAP National and AMS generated and distributed documents soliciting support for HLF after its assets were seized by the OFAC. The district court recognized that these activities were not against the law, "[b]ut all of this does tend to evidence a desire on the part of IAP to help Hamas succeed." 340 F.Supp.2d at 911. *See* note 11, *supra*.

Fifth, IAP had held annual conferences, invited pro-Hamas speakers to participate in these gatherings, and paid their travel expenses. An IAP conference in 1989 had featured a veiled Hamas terrorist as a guest speaker. A 1996 IAP conference had featured the leader of Muslim Brotherhood of Syria along with the wife of Marzook, who by that time had been in federal custody in the United States for more than a year and a half. An excerpt from Steven Emerson's book, *American Jihad, The Terrorists Living Among Us,* identified other instances in which Hamas leaders and supporters had spoken at IAP conferences, including four occasions on which such individuals called for jihad, urged the audience to take up arms against Israel, spoke in support of martyrdom operations, and advocated support for the families of martyrs. Jaber admitted that each of these identified speakers had in fact spoken, but said he could not remember whether they made the statements Emerson attributed to them.[12]

The district court believed that this was sufficient to show that IAP and AMS had the intent to aid Hamas's terrorist activities and in fact engaged in some acts of assistance. 340 F.Supp.2d at 912–13. The record convinced the court that "if IAP never outrightly cheered on Hamas's terrorist activities, it has come quite close[;][c]ertainly IAP has never condemned Hamas' tactics." *Id.* at 912. Although Jaber averred that IAP took no position on whether suicide bombings, for example, were right or wrong, the record revealed that IAP had, in fact, praised Hamas's terrorist activities, albeit "somewhat subtly." Jaber admitted, for example, that IAP had published articles and editorials characterizing suicide bombers as martyrs and freedom fighters; Jaber simply said that IAP took no position on those characterizations. *Id.* The court accepted the notion that opposition to Israel does not equate with support for Hamas. *Id.* at 912–13. But expressing opposition by way of suicide bombings and other terrorist attacks like the shooting of David Boim appeared to the court to be "precise-

---

12. There may well have been a hearsay problem with relying on Emerson's book as proof of what these speakers said at the IAP conferences. *See, e.g., Am. Nat'l Fire Ins. Co. v. Rose Acre Farms, Inc.,* 107 F.3d 451, 456 (7th Cir.1997). What the speakers themselves said would be admissible for their state of mind, but as proof that the speakers actually made these statements, Emerson's book, which itself is, of course, an out-of-court statement, would constitute hearsay. *See Schindler v. Seiler,* 474 F.3d 1008, 1011 (7th Cir.2007).

ly what Hamas is about." *Id.* at 913. Pursuant to *Boim I*, those who help to fund, directly or indirectly, Hamas's terrorist activities are liable to the same extent as those who commit the terrorist acts. *Id.* Jaber's declaration, which asserted that neither IAP nor AMS supported terrorist activities, engaged in helping, or intentionally or knowingly gave money to support such acts, struck the court as conclusory and self-serving. *Id.*[13] Moreover, Jaber's affidavit did nothing to refute the evidence that IAP provided material support to Hamas during years that he was not a member and president of IAP. *Id.*

What is strikingly absent from the district court's analysis is any consideration of a causal link between the assistance that the court found AMS/IAP to have given Hamas and the murder of David Boim. The court made no finding as to the existence of such a link, nor did it acknowledge that causation was a necessary element of the Boims' case. *See id.* at 912–13.

Indeed, in its subsequent discussion of Salah's liability, the court appears to have said that no such causal link was required:

> The Seventh Circuit did not say that, to impose liability under § 2333, the Boims have to link Mr. Salah or any of the other defendants specifically to the attack that killed David Boim; rather, the court held that, to impose liability for aiding and abetting—that is, providing material support to [14]—a terrorist organization, the Boims need only show that the defendants knew of Hamas' illegal activities, that they desired to help those activities succeed, and that they engaged in some act of helping. *Boim,* 291 F.3d at 1028. The evidence shows that all three are true with respect to Mr. Salah and no reasonable jury could find otherwise.

340 F.Supp.2d at 923. The court added that Salah would be liable under civil conspiracy principles for acts in furtherance of a conspiracy to fund Hamas, even if those acts were committed after he ceased being an active participant (assuming that he did not withdraw from the conspiracy and disavow its aim). Thus, even if plaintiffs could not establish that Salah provided

---

**13.** Of course, the fact that Jaber's affidavit was self-serving was not a reason to disregard it. Most affidavits are. *See Payne v. Pauley,* 337 F.3d 767, 772–73 (7th Cir.2003). It does, however, go to the weight of the evidence, which would be for the factfinder to assess. Ascertaining a party's state of mind typically requires credibility assessments that cannot be made on summary judgment. *See, e.g., Ashman v. Barrows,* 438 F.3d 781, 784 (7th Cir.2006) (citing, *inter alia, McGreal v. Ostrov,* 368 F.3d 657, 677 (7th Cir.2004)). Thus, where the party seeking summary judgment presents circumstantial or indirect evidence that is consistent with the requisite knowledge or intent, but is also subject to other interpretations, a general denial by the party whose mental state is at issue will normally suffice to establish a dispute of fact for the factfinder to resolve at trial. *See, e.g., United States v. Cleckler,* 270 F.3d 1331, 1335–36 (11th Cir. 2001) (per curiam). Only in the face of direct evidence that a party knew or intended a

particular thing (*e.g.,* a party's prior admission) will a bare, general denial of knowledge or intent be insufficient to create a dispute of material fact in the face of direct evidence that the party knew or intended a particular thing. *See Lorillard Tobacco v. A & E Oil, Inc.,* 503 F.3d 588, 594 (7th Cir.2007).

**14.** [Footnote added by this court] Although providing material support to a terrorist organization would be one way to aid and abet that organization's terrorist activities, one could aid and abet the organization's terrorist acts in other ways as well. Lending material support to terrorist activity or a terrorist organization is actually a theory of liability that is separate and distinct from aiding and abetting an act of international terrorism, as our opinion in *Boim I* makes clear. Compare section II(B) of *Boim I,* 291 F.3d at 1012–16 (discussing material support), with section II(C), *id.* at 1016–21 (discussing aiding and abetting).

material support to Hamas (which, in the court's view, they had shown, though it did not expand on this point), Salah could still be liable to the Boims if their son's death was a reasonably foreseeable consequence "of the conspiracy that was Hamas." *Id.* at 924.[15]

The Boims defend the district court's silence as to causation (and in Salah's case, the court's apparent rejection of the need for proof of cause in fact) on the ground that our opinion in *Boim I* did not require it. In their view, all that need be shown is that it was foreseeable to the defendants that their support of Hamas might result in someone's death. This constitutes a profound misreading of our decision in *Boim I*.

Contrary to the district court's apparent impression, this court's opinion in *Boim I* did not relieve plaintiffs of the burden of showing causation in fact. As we discuss below, the theory of liability that the Boims advanced in support of their complaint in the prior appeal assumed that they would be able to demonstrate causation in fact. Consequently, we were not called upon to discuss, and there was no need for us to consider, whether the plaintiffs could obtain relief without establishing that the defendants' actions were a cause in fact of David Boim's death. Our focus instead was on the doctrine of proximate cause and specifically its requirement (sometimes referred to as the concept of legal cause) that the injury complained of by the plaintiff have been foreseeable to the defendant. *Boim I*, 291 F.3d at 1012 ("Foresee-ability is the cornerstone of proximate cause, and in tort law, a defendant will be held liable only for those injuries that might have been reasonably anticipated as a natural consequence of the

defendant's actions.") (citing *Suzik v. Sea-Land Corp.*, 89 F.3d 345, 348 (7th Cir. 1996), and RESTATEMENT (SECOND) OF TORTS (hereinafter "RESTATEMENT (SECOND)") §§ 440–47). *See* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL HARM (Proposed Final Draft No. 1) (hereinafter "RESTATEMENT (THIRD)") § 29; Dan B. Dobbs, THE LAW OF TORTS § 182, at 447–48 (2000) (distinguishing proximate cause from cause in fact); W. Page Keeton, PROSSER & KEETON ON THE LAW OF TORTS § 42 (5th ed. 1984). But by saying that David Boim's death must have been a type of harm that was foreseeable to the defendants, and that the plaintiffs were obligated to prove this, we in no way implied that the plaintiffs were relieved of the obligation to establish that the defendants' actions were a factual cause of his death. On the contrary, there are multiple references in *Boim I* to the necessity of causation in fact. At the risk of repeating ourselves, we now undertake yet another review of our prior decision, this time with a focus on what we said (or what we assumed) on the subject of cause in fact.

We began our analysis in *Boim I* by noting that 18 U.S.C. § 2333(a) grants any U.S. national *"injured ... by reason of* an act of international terrorism" the right to sue for his injury. 291 F.3d at 1008 (emphasis added); *see also id.* at 1010, 1011. "International terrorism" is in turn defined to include "activities that ... involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." 18 U.S.C. § 2331(1)(A).

---

**15.** We note that the court did not discuss what proof there was that Hamas constituted a conspiracy, what the aims and scope of the conspiracy were, when it was formed, when Salah joined it, and so forth.

We observed that the legislative history of the statute reveals an intent to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law. 291 F.3d at 1010. We added that the statute itself reflects all of the elements of a traditional tort: a breach of duty (committing an act of international terrorism), an injury to the person, etc. of another, *and causation* (injured "by reason of"). *Id.* (emphasis added).

What the statute does not do is identify the class of defendants who may be held liable, and this was the question that we proceeded to answer. We stated that the statute was clearly meant to reach not only those individuals who themselves commit the violent act that directly causes the injury (291 F.3d at 1011), but rather extends to "anyone along the *causal* chain of terrorism," *id.* (emphasis added). We added, however, that funding a terrorist organization by itself would not be enough to place someone in this causal chain. *Id.* at 1011–12. To say that funding alone sufficed would give the statute an almost unlimited reach. *Id.* at 1012. Rather, in addition to establishing funding (or some other act of supporting terrorism), the plaintiff would have to establish the defendant acted with knowledge of the terrorist activity and the intent to support that activity. *Id.* Moreover, the statute bestows the right to sue on a person injured "by reason of" an act of international terrorism, and that language, we said, requires a showing of proximate causation, which in turn requires proof that the injury was foreseeable to the defendant. *Id.* at 1011–12. "In the very least, the plaintiffs must be able to show that murder was a reasonably foreseeable *result of* making a donation." *Id.* at 1012 (emphasis added).

We made the same point in discussing why proof that a defendant had provided material support or resources to terrorists, in violation of 18 U.S.C. §§ 2339A and 2339B, would be one route to relief under section 2333. We reasoned that if a defendant's conduct meets the standard for criminal liability under either of these provisions, that conduct would constitute an act of international terrorism for purposes of civil liability under section 2333, so long as the defendant's knowledge and intent were also shown. 291 F.3d at 1014–15. We added that support or resources provided need not be substantial or considerable, notwithstanding the use of the term "material" in both of the criminal provisions. The statute defines what constitutes material support or resources, so the term "material" "relates to the type of aid provided rather than whether it is substantial or considerable." *Id.* at 1015. So even small donations made knowingly and intentionally in support of terrorism might suffice to render the donor liable. *Id.* However, we again noted that for purposes of civil liability, section 2333 requires that one be injured "by reason of" an act of international terrorism. *Id.* Because Congress intended to import traditional tort principles, we added, "causation may be demonstrated as it would be in traditional tort law." *Id.*

And we again made this point in recognizing that aiding and abetting an act of international terrorism would support a civil suit under section 2333. The plaintiffs theorized that aiding and abetting a violent act is itself an act of international terrorism. We agreed, recognizing that Congress meant to extend section 2333 liability beyond those directly perpetrating acts of terrorism. The fact that section 2331 defined international terrorism to include acts that "involve" violent or life-endangering acts itself suggested a broad sweep. 291 F.3d at 1020. Section 2333, we again emphasized, reflects a congressional intent to incorporate traditional tort

principles. *Id.* Activity that "involves" violent acts would certainly cover conduct that aids and abet violent acts. *Id.* So although the statute did not expressly authorize this theory of liability, we believed it was appropriate to extend liability to those who aid and abet acts of international terrorism. *Id.* at 1020–21.

Cause in fact also figured into our rejection of the assertion by HLF and QLI that it would be incompatible with the First Amendment to hold them liable to the Boims on the basis of money that they raised and donated to Hamas and its intermediaries for humanitarian purposes. We emphasized that the defendants could be liable to the Boims if, for example, they had aided and abetted David Boim's murder by taking some step that aided Hamas's terrorism while knowing of its terrorist activities and desiring to help those activities succeed. 291 F.3d at 1023. Thus, the Boims theorized that HLF and QLI were front organizations that raised money ostensibly for legitimate humanitarian purposes but then funneled that money to Hamas, knowing and intending that Hamas would use the funds to arm and train terrorists, including the men who killed David Boim. We deemed this theory compatible with the First Amendment in that it did not seek to hold defendants liable for mere association with Hamas or for giving money to aid its humanitarian efforts. *Id.* at 1024–25.

Thus, implicit if not explicit throughout *Boim I*'s analysis is the notion that there must be a causal link between the defendant's actions and the plaintiff's injury. This is evident in our observations that section 2333 gives anyone "injured by reason of" terrorist activity the right to sue, that liability was meant to extend all along the chain of causation, and that Congress meant to incorporate traditional tort principles. *See* 291 F.3d at 1010, 1011, 1015,

1021. But to the extent our opinion in *Boim I* leaves any doubt on this score—owing perhaps to the fact that the Boims' theories at that time presupposed a causal link between the defendants' acts and the murder of David Boim—we now reiterate that recovery under section 2333 is conditioned on proof of causation in fact.

We return to our point of embarkation in *Boim I*: the language of the statute. The statute grants a right to sue to anyone injured "by reason of" an act of international terrorism. 18 U.S.C. § 2333(a). That language itself suggests that there must be some causal link between the particular act of international terrorism that the defendant is alleged to have committed (or aided and abetted) and the injury suffered by the plaintiff. Indeed, we specifically recognized in *Boim I* that this language meant causation. 291 F.3d at 1010.

*Boim I* noted repeatedly that Congress when it enacted section 2333 intended to embrace traditional tort principles, *id.* at 1010, 1015, 1020, and cause in fact is a requirement for all torts. The Restatement makes the point unequivocally:

> Tortious conduct must be a factual cause of physical harm for liability to be imposed. Conduct is a factual cause of harm when the harm would not have occurred absent the conduct....

RESTATEMENT (THIRD) § 26 ("Factual Cause"); RESTATEMENT (SECOND) § 9 comment b ("[i]n order that a particular act or omission may be the legal cause of an invasion of another's interest, the act or omission must [*inter alia*] be a substantial factor in bringing about the harm ..."); *id.* § 431 comment a (in order for actor's conduct to be considered legal cause of another's harm, it is necessary although not sufficient that "the harm would not have occurred had the actor not been negligent"); *see also* § 430 comment e (noting

that causation principles for negligence apply to intentional torts as well); *cf. Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters,* 459 U.S. 519, 547–48, 103 S.Ct. 897, 913, 74 L.Ed.2d 723 (1983) (Marshall, J., dissenting) ("Although many legal battles have been fought over the extent of tort liability for remote consequences of *negligent* conduct, it has always been assumed that the victim of an *intentional* tort can recover from the tortfeasor if he proves that the tortious conduct was a cause-in-fact of his injuries.") (emphasis in original). This is often referred to as but-for causation. RESTATEMENT (THIRD) § 26 comment b. One must ask what would have occurred if the actor had not engaged in the tortious conduct. *Id.* comment e.

The foreseeability component of proximate cause (or legal cause), which we discussed in *Boim I,* is not a replacement for or an alternative to cause in fact, but rather confines an actor's responsibility to injuries that were both factually caused by his tortious conduct *and* were the type of injuries that he foreseeably risked by his conduct. RESTATEMENT (THIRD) § 29; Dobbs, § 180 at 443–45. Put another way, factual causation is a necessary but not a sufficient basis for liability. RESTATEMENT (SECOND) § 431 comment a; *see Carris v. Marriott Int'l, Inc.,* 466 F.3d 558, 560 (7th Cir.2006) (" 'but for' causation . . . is never enough for liability"); *Sementilli v. Trinidad Corp.,* 155 F.3d 1130, 1139 (9th Cir. 1998) (T.G. Nelson, J., specially concurring) (court does not reach foreseeability if cause in fact has not been shown). The foreseeability requirement thus serves to limit rather than expand the set of tortfeasors who may be liable for the plaintiff's injury. Dobbs § 180 at 443; *see, e.g., Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 267–68, 112 S.Ct. 1311, 1317–18, 117 L.Ed.2d 532 (1992). In short, a tortfeasor cannot be held liable for any

injury that his acts foreseeably might have caused without there also being proof that his conduct *did* cause that injury.

■ Neither the aiding and abetting theory of liability, which we endorsed in *Boim I,* nor civil conspiracy, which the Boims pursued in their amended complaint on remand, obviates the need for a showing of cause in fact. Neither is an independent tort; each is simply a vehicle for spreading liability for a tortious act committed by another. *E.g., Hefferman v. Bass,* 467 F.3d 596, 600–601 (7th Cir.2006); *see* RESTATEMENT (SECOND) § 876 comment b; Dobbs § 340 at 936–38; PROSSER & KEETON § 46 at 322–24. So although the Boims might prevail by showing that a defendant aided and abetted someone else (*e.g.,* HLF) in providing material support or resources to Hamas for its terrorist activities—for example, by hosting a fundraiser for HLF, knowing and intending that the funds raised would be funneled to Hamas to support terrorism—there still must be proof that the provision of material support or resources was in some way a cause of David Boim's death. It is not enough to show simply that a defendant generally aided and abetted HLF or even Hamas as organizations; there must be proof that the defendant aided and abetted them in the commission of tortious acts that have some demonstrable link with David Boim's death. The same is true of conspiracy. The mere agreement to engage in illegal activity is not enough to impose civil liability on the conspirator; rather, one must have conspired with someone who committed a tort. *See Beck v. Prupis,* 529 U.S. 494, 501–04, 120 S.Ct. 1608, 1614–15, 146 L.Ed.2d 561 (2000); *see also, e.g., Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 206 Ill.Dec. 636, 645 N.E.2d 888, 894 (1994), *abrogation on other grounds recognized by Burgess v. Abex Corp. ex rel. Pneumo Abex Corp.,* 311 Ill.App.3d

900, 244 Ill.Dec. 319, 725 N.E.2d 792, 795 (2000). In that sense, civil liability for engaging in a conspiracy is distinct from criminal liability. 206 Ill.Dec. 636, 645 N.E.2d at 894. Thus, for purposes of liability under section 2333, a plaintiff must show that the defendant aided and abetted, or conspired with others to commit, an act of international terrorism that resulted in injury to the plaintiff.

There are any number of ways in which the plaintiffs might be able to establish causation in fact. One way, of course, would be to establish a direct causal link between the defendants' acts and the murder of David Boim. The plaintiffs posited such a link in *Boim I,* theorizing that the defendants had channeled funds into a central pool of money that was used to train terrorists, buy their weapons, and so forth—and that the terrorists who killed David Boim had been trained and armed using those funds. *See Burnett v. Al Baraka Invest. & Dev. Corp.,* 274 F.Supp.2d 86, 107 (D.D.C.2003) ("It must be acknowledged that the complaint in *Boim* was quite specific in its allegation of a causal link...."). There might be alternative and less direct routes to proving causation as well.

Nothing in *Boim I* demands that the plaintiffs establish a direct link between the defendants' donations (or other conduct) and David Boim's murder—that they funded in particular the terrorists who killed David Boim, for example—in view of the fact that money is fungible and the victims of terrorism are often killed or injured at random, as he was. In that respect, the district court was no doubt correct when it said that the Boims need not link the defendants specifically to the attack on David Boim. 340 F.Supp.2d at 923. A factfinder reasonably could conclude those who provide money and other general support to a terrorist organization are as essential in bringing about the organization's terrorist acts as those who plan and carry out those acts. *See Boim I,* 291 F.3d at 1021. For that reason, we reject AMS's suggestion (AMS Reply Br. at 6) that a $10,000 donation made by a defendant to Hamas or its affiliate with the requisite knowledge and intent that the money will support terrorism could not be deemed a cause of a subsequent terrorist act absent proof that the donor envisioned that particular act. But the plaintiffs still must offer some proof that permits a finding by a preponderance of the evidence that the defendants' conduct caused terrorist activity that included the shooting of David. For example, the Boims have pointed out that in his August 1995 statement, Salah wrote that in the early 1990s, he had helped to test and train terrorists, funneled money to Hamas for the purchase of weapons, and had coordinated with other Hamas leaders in rebuilding Hamas's infrastructure and command. R. 265–2 Ex. 15 at 1783–95; *see* 340 F.Supp.2d at 920. If one were to credit Salah's statement, one reasonably might conclude that any number of terrorist acts subsequently committed by Hamas (and the resulting injuries) were in part caused by Salah's actions, even if Salah had no role in planning and executing a particular terrorist act. Similarly, if an individual or organization established a funding network in the United States designed to provide ongoing financial support for Hamas's terrorist activities, a factfinder might reasonably infer that the act of establishing that network was a cause of ensuing acts of Hamas terrorism, even if no line could be drawn linking a particular dollar raised to a particular terrorist act. As these hypotheticals suggest, the nature and significance of a defendant's action along with its chronological relationship to the terrorist act that injured the plaintiff would be important considerations in assessing whether the

defendant caused the plaintiff's injury. Terrorist acts that follow within a reasonable time the donations and other support provided by a defendant to the perpetrators of those acts could be deemed to have been caused by those acts; and the more significant the support provided by a defendant, the more readily one might infer that support was a cause of later terrorist acts.

We add that a defendant's conduct need not be the sole circumstance responsible for a terrorist act in order to qualify as a cause in fact; it is enough that it be *a* cause of the act and the resulting harm. RESTATEMENT (THIRD) § 26 comment c; *see also id.* comment *l*; RESTATEMENT (SECOND) § 430 comments d, e. Proof that HLF was funding Hamas's terrorist activities at the time of David Boim's murder, and that another defendant was in turn funneling donations to HLF with the knowledge and intent that those funds be used to support Hamas's terrorism, might support an inference that the actions of both HLF and that defendant were causes of the murder. Alternatively, if the plaintiffs were able to show that by providing funding to Hamas's other activities, including the hospitals, schools, and other charitable missions that it sponsors, a donor frees up Hamas resources for, or otherwise makes possible, Hamas's terrorist activities, then proof that the defendants provided support to Hamas ostensibly for its humanitarian activities, but with the knowledge and intent that Hamas be able to conduct terrorism also, might support the inference that the defendants were a cause of terrorist activity of the kind that resulted in David Boim's death. But without *some* evidence of a causal link between a defendant's conduct and Boim's murder, proof that a defendant supported, aided and abetted, or conspired with Hamas (or an intermediary like HLF) will not suffice to render that defendant liable to the Boims.

Permitting liability to be imposed on a defendant based solely on proof that the death of David Boim was a foreseeable result of the defendant's conduct, without proof that the conduct actually was a cause of the death, would give section 2333 a far broader sweep than traditional tort principles would allow. The actual use to which the funds and other support that the defendants allegedly provided to Hamas and its intermediaries was put would be irrelevant. This would transform the doctrine of proximate causation from a principle that limits tort liability into one that expands liability, essentially rendering a defendant who intended to aid Hamas's terrorist activities strictly liable for all foreseeable injuries even if that defendant's aid actually did nothing to enable the terrorism and the injuries it inflicted. *Cf. Associated Gen. Contractors of Calif., supra,* 459 U.S. at 537, 103 S.Ct. at 908 (majority opinion) (allegation of defendant's intent to cause harm insufficient to establish plaintiff's right to recover for alleged antitrust violation) (citing *Blue Shield of Va. v. McCready,* 457 U.S. 465, 479, 102 S.Ct. 2540, 2548, 73 L.Ed.2d 149 (1982)); *see* RESTATEMENT (SECOND) § 435A comment a ("even where the tortfeasor intends a specific result which follows, there must be a causal connection between his action and the result").

None of this should be understood to rule out the possibility that relatively modest financial contributions to terrorists or other minor acts of support would be sufficient to render the donor liable for the injuries subsequently inflicted by terrorists. *See Boim I,* 291 F.3d at 1015. As we have noted, but-for causation does not demand a showing that the defendant's conduct was the sole cause of the plaintiff's injury; the conduct need only be one of the causes. RESTATEMENT (THIRD) § 26 comments c and *l*; RESTATEMENT (SECOND)

§ 430 comments d and e. Nor must the plaintiff show that the defendant's conduct was the predominant or primary cause of the injury. RESTATEMENT (THIRD) § 26 comments j and l. A plaintiff might well be unable to show that a terrorist organization such as Hamas depended on a particular donor to support its terrorism, for example, or that one act of terrorism owed its existence to a specific donation. But a careful showing that many small donations collectively resulted in a cache of funds that in turn enabled a series of terrorist acts would permit a factfinder reasonably to infer a causal connection between the contribution made by a single donor and one of the terrorist acts made possible by that donor and others like him, even if a single donation would not by itself have been enough to cause that terrorist act. See RESTATEMENT (THIRD) § 26 comments c, i.

The viability of any of the potential theories of causation in fact we have discussed would of course turn on the evidence presented. We are necessarily speaking in a vacuum at this juncture, given that the district court made no finding as to causation in fact and the Boims have not attempted to show causation in fact here. A more definitive assessment of what evidence will suffice to support a finding of cause in fact must await the presentation of that evidence. It is enough for us now to reiterate that Congress meant for liability to extend the full length of the causal chain of terrorism.

We do not believe our requirement that causation in fact be shown is inconsistent with the D.C. Circuit's opinion in *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C.Cir.2004), on which the Boims rely. *Kilburn* did eschew what the D.C. Circuit thought would be a stringent requirement of but-for causation, but it did so solely for purposes of establishing jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(7) ("FSIA"). *Kilburn* expressly left open the possibility that but-for causation might be necessary for purposes of liability. And as we shall discuss below, we believe a more expansive view of causation in fact addresses the concerns that *Kilburn* voiced about but-for causation.

*Kilburn* was a suit against Libya (among other defendants) for the kidnaping and murder of an American citizen, Kilburn, who had been working in Beirut. The complaint alleged that the terrorist group Hizbollah had abducted Kilburn and sought ransom for his return. While the U.S. was attempting to negotiate his release, the Libyan government made it known that it wanted to procure an American hostage whom it would murder in retaliation for recent U.S. airstrikes on Libyan soil. Thereafter, a terrorist group sponsored and directed by Libya allegedly purchased Kilburn from Hizbollah, tortured him, and ultimately killed him. By the terms of the FSIA, foreign states are immune from suit in U.S. courts unless one of the statutory exceptions applies. 28 U.S.C. § 1604. One such exception authorizes a suit for damages against a foreign state "for personal injury or death that was *caused by* an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, agent of such foreign state while acting within the scope of his or her office, employment, or agency ...." § 1605(a)(7) (emphasis supplied). The D.C. Circuit agreed that the "caused by" language of this provision demanded proof of a causal link between the foreign state's acts and the victim's injuries, 376 F.3d at 1128, but it rejected Libya's contention that but-for causation

must be shown, *id.* at 1128–29. The court recognized that depending on what one understands but-for causation to mean, it can either be a restrictive or an expansive standard for liability. *Id.* at 1127 n. 2. The court understood Libya to be arguing in favor of a highly restrictive understanding of but-for causation, and the court was concerned that a demanding causation standard might inappropriately render state sponsors of terrorism immune from suit. In particular, the court believed that where multiple foreign states were providing general support to a terrorist organization, it would be difficult to show that any one of them was literally the *sine qua non* cause of the injuries inflicted by that organization's terrorist acts—with the result that all of the sponsoring states might be rendered immune from suit. *Id.* at 1129. Relying on the Supreme Court's decision in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 536–38, 115 S.Ct. 1043, 1049–51, 130 L.Ed.2d 1024 (1995), which construed identical language in a federal admiralty statute, the D.C. Circuit held a showing that a foreign state's conduct proximately caused the plaintiff's injuries was sufficient for purposes of jurisdiction under the FSIA. 376 F.3d at 1128.

However, the D.C. Circuit was quick to clarify that its holding was limited to what was necessary in order to assert jurisdiction over a foreign state and did not address what proof would be necessary in order to impose liability on that state.

> [W]e underline that the only issue before us here is *jurisdictional* causation, because § 1605(a)(7) is solely a jurisdictional provision. *Cicippio–Puleo* [*v. Islamic Republic of Iran* ], 353 F.3d [1024] at 1032 [(D.C.Cir.2004)]. To succeed in the end, the plaintiff must go beyond jurisdiction and provide proof satisfying a substantive cause of action. *Id.* The plaintiff has alleged a number of sources that could provide a cause of action, including state, federal, foreign, and international law. Whatever the ultimate source may be, it will no doubt carry with it—as a matter of substantive law—its own rules of causation. Of these, there are a large variety. *See* Prosser & Keeton at 266–68, 273. Any concerns about reaching too far to charge foreign states with the attenuated impact of their financial activities are better addressed as questions of substantive law....

376 F.3d at 1129 (emphasis in original). *See also Rux v. Republic of Sudan,* 461 F.3d 461, 472–73 (4th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 1325, 167 L.Ed.2d 78 (2007).

Moreover, in requiring a showing of proximate cause alone, *Kilburn* did not purport to relieve the plaintiff of showing that the defendant's conduct actually caused his or her injury. On the contrary, the *Kilburn* court, quoting approvingly from the PROSSER & KEETON treatise, acknowledged that a showing of proximate cause requires there to be " 'some reasonable connection between the act of omission of the defendant and the damage which the plaintiff has suffered.' " 376 F.3d at 1128, quoting PROSSER & KEETON at 263. *See also Owens v. Republic of Sudan,* 412 F.Supp.2d 99, 111–12 (D.D.C.2006) (construing *Kilburn* to require a showing of cause in fact).

The Supreme Court's decision in *Grubart,* on which the *Kilburn* court relied, likewise makes clear that proximate cause entails proof of an actual factual nexus between the defendant's acts and the plaintiff's injury. *Grubart* arose from a 1992 flood in Chicago's Loop commercial district, which briefly brought the city's downtown to a standstill and caused millions of dollars in losses to area businesses.

The flood occurred after a dredging company replacing pilings in the Chicago River accidentally drove one or more of the new pilings too deep into the riverbed and weakened an old freight tunnel that ran below the river; when the tunnel collapsed months later, river water flooded the entire tunnel system and, along with it, basements throughout the business district. In the face of multiple lawsuits, the dredging company, invoking admiralty jurisdiction, filed suit in federal court seeking to limit its liability to the value of the tugboat and two barges it had been using to replace the pilings. *See* Limitation of Vessel Owner's Liability Act, 46 U.S.C.App. § 181, *et seq.* The existence of admiralty jurisdiction turned in part on whether the relevant injury had been "*caused by* a vessel on navigable water." 46 U.S.C.App. § 740 (emphasis supplied) (since recodified at 46 U.S.C. § 30101). Because the pilings whose installation had resulted in the tunnel collapse had been placed in the riverbed using a crane perched upon a barge in the Chicago River, the Court had no difficulty concluding that the barge had caused the complained-of injuries. 513 U.S. at 534–35, 115 S.Ct. at 1049. Indeed, the question before the Court in *Grubart* was not whether the dredging company's barge had actually caused the flood, but rather whether the resulting injuries were too remote from the barge and navigable waters to support admiralty jurisdiction. The respondents in *Grubart* (who, not surprisingly, were contesting the dredging company's resort to admiralty in an effort to limit its liability) contended that damages must occur closely in both space and time to a vessel's tortious activity in order to permit a vessel owner to invoke admiralty jurisdiction and that cause in fact was not enough. It was this argument that the Supreme Court rejected:

> The demerits of this argument lie not only in its want of textual support for its nonremoteness rule, but in its disregard of a less stringent but familiar proximity condition tied to the language of the statute. The Act uses the phrase "caused by," which more than one Court of Appeals has read as requiring what tort law has traditionally called "proximate causation." This classic tort notion normally eliminates the bizarre, and its use should obviate not only the complication but even the need for further temporal or spatial limitations....

*Id.* at 536, 115 S.Ct. at 1049–50 (citations omitted).

Finally, we note that the facts alleged in *Kilburn* and similar cases would readily permit a factfinder to find but-for causation as we have framed it. As we have discussed, a defendant's conduct need not be the sole or even primary cause of the plaintiff's injury in order to be considered a cause in fact of that injury. *Ante* at 741–43. Rather, it is sufficient if the defendant's conduct is one of the causes of the injury. In *Kilburn*, such a link could readily be inferred from the facts alleged: Libyan agents in Lebanon let it be known that Libya was interested in purchasing an American hostage, and thereafter a hostage was procured from Hizbollah and killed by a terrorist group allegedly supported and directed by the Libyan government. 376 F.3d at 1129–30. Similarly in *Rux*, it was alleged that Sudan had aided and abetted the October 2000 al-Qaeda attack on the *U.S.S. Cole* (which took the lives of seventeen sailors) by, *inter alia,* allowing al-Qaeda to use Sudan's diplomatic pouch to ship explosives, allowing al-Qaeda operatives to enter Sudan and train terrorists there, and allowing the shipment of explosives from Sudan to Yemen, where the bombing took place. 461 F.3d at 473–74. Although, as the Fourth Circuit recognized, the allegations did not make clear how closely in time Sudan's alleged acts

occurred in relation to the bombing and did not otherwise "chart a direct and unbroken factual line between Sudan's actions and the bombing," *id.* at 474, they nonetheless reasonably supported an inference that Sudan's support helped bring about the bombings. *See also Owens,* 412 F.Supp.2d at 102–03, 113–14 (finding jurisdiction under FSIA's exception for state-sponsored terrorism) (Sudan allegedly supplied shelter, security, financial support, and business opportunities to both al-Qaeda and Hizbollah during planning of August 1998 bombings of U.S. embassies in Nairobi and Dar es Salaam); *Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13, 19–22 (D.D.C.2002) (concluding on entry of default judgment under FSIA that Iran was a but-for cause of suicide bombing perpetrated by Hamas, where, *inter alia,* Iran had provided substantial funding to Hamas and Iranian military instructors had trained Hamas terrorists in use of explosives); *Mousa v. Islamic Republic of Iran,* 238 F.Supp.2d 1, 11 (D.D.C.2001) (finding that Iran's provision of "massive material and technical support" to Hamas, including financial aid and use of Iranian military instructors to train Hamas terrorists in use of explosives, firearms, and grenades, supported entry of default judgment against Iran under FSIA for suicide bombing perpetrated by Hamas); *Eisenfeld v. Islamic Republic of Iran,* 172 F.Supp.2d 1, 8 (D.D.C.2000) (same).

In sum, *Kilburn* does not support the proposition that a defendant can be held liable under section 2333 absent proof that its conduct was a cause in fact of the plaintiff's injury. At most, *Kilburn* counsels against a rigid and unduly narrow view of factual causation. Our own understanding of causation, we believe, is not so narrow and unyielding. It is sufficiently flexible to account for the reality that a terrorist act may have many causes without abandoning the longstanding tort requirement that an act have some factual nexus with the plaintiff's injury before it may be deemed a basis for liability.

As we have noted, the district court, in granting summary judgment in favor of the plaintiffs and against AMS/IAP on the question of liability, made no finding of cause in fact. Instead, citing criteria we set out for aiding and abetting, the court assumed that the Boims need only show that AMP/IAP knew of Hamas's illegal activities, desired to help those activities succeed, and engaged in some act of assisting Hamas. 340 F.Supp.2d at 906, 916; *see also id.* at 923. The plaintiffs have identified no proof of causation, contending that aiding and abetting and conspiracy theories of liability do not require such proof. That notion, as we have set forth above, is mistaken. Some type of causal link between the defendants' conduct and the death of David Boim must be shown, regardless of what theory of liability the plaintiffs rely upon.

The district court therefore erred in resolving liability in favor of the Boims and against AM/IAP on summary judgment. Absent a record that revealed no dispute of material fact as to whether AMS/IAP's actions in support of Hamas in some way caused David Boim's death, the Boims were not entitled to summary judgment on liability.

The most appropriate step at this juncture is to remand this case to the district court for reconsideration. We are aware that AMS/IAP filed a cross-motion for summary judgment based in part on the lack of proof that its alleged conduct was a cause in fact of David Boim's death. However, because the district court shared the plaintiffs' misapprehension as to the necessity of such proof, we believe the district court should revisit this question on remand. Our remand order is without prej-

udice to AMS/IAP (or for that matter, HLF or Salah) renewing its motion for summary judgment on this element of the plaintiffs' case. If the Boims are unable to identify evidence sufficient to permit a reasonable inference that AMS/IAP's conduct was a cause in fact of David Boim's murder, then AMS/IAP will be entitled to judgment in its favor. If the court concludes that there is a material dispute of fact as to the causal link between AMS/IAP's conduct and the murder of David Boim, then AMS/IAP will be entitled to a jury trial on that question.

We note that neither AMS/IAP nor any of the other appellants has challenged the amount of damages that the jury awarded to the Boims. Therefore, if the district court on remand concludes that the undisputed facts establish a causal link between a defendant's conduct and David Boim's murder, the court may reinstate the judgment as to that defendant. If the court finds that the evidence necessitates a trial as to cause in fact as to any defendant, then the judgment may be reinstated against any defendant whose conduct the jury determines to be a cause in fact of David's death.

## IV.

### Mohammad Salah

The partial summary judgment entered against Salah is flawed for the same reasons that we have discussed as to AMS/IAP. Although there was a separate set of facts regarding Salah's links to Hamas (which Salah does not contest for purposes of this appeal), the district court relied on the same incomplete recitation of what would be necessary to establish a defendant's liability as an aider and abettor. The court stated that Salah would be liable for David Boim's death so long as he knew of Hamas's terrorist activities, desired to help those activities succeed, and engaged in some act of helping. 340 F.Supp.2d at 923. The court did not insist on any proof of cause in fact or make any finding that Salah's actions in support of Hamas, and/or his participation in the undefined "conspiracy that was Hamas," *id.* at 924, had any causal nexus with David Boim's murder. *See id.* at 923.

The court's statement that *Boim I* did not require a link to David Boim's death in particular, *id.*, was correct insofar as a direct link between Salah's actions and the killing of David Boim need not be shown. We have mentioned above ways in which indirect causation might be proven. But *Boim I* certainly did not relieve the plaintiffs of establishing some form of causal link between a defendant's actions and David Boim's murder.

Salah was in Israeli custody in 1996 at the time of David Boim's murder and the plaintiffs have identified no evidence that he gave any sort of meaningful support to Hamas after January 1993 (when he was arrested), some forty months prior to the murder. The district court relied on conspiracy principles to say that Salah could be liable for acts post-dating his active involvement in the Hamas conspiracy so long as he did not renounce Hamas and withdraw from the conspiracy prior to David's killing. *Id.* at 923–24.

There are at least two problems with this rationale. First, as we have discussed above, proof that Salah conspired with others in support of Hamas's terrorist aims and activities does not render Salah per se liable for all those injured by Hamas terrorists. *Adcock v. Brakegate, supra,* 206 Ill.Dec. 636, 645 N.E.2d at 894. Second, the plaintiffs' theory that Salah was a member of a Hamas-related conspiracy is not adequately supported. The Boims did not cite this theory as a possible basis for summary judgment against Salah until

they filed their consolidated memorandum in opposition to Salah's motion for summary judgment and in reply in support of their own motion for summary judgment. R. 352 at 12–14. Even at that juncture, the Boims did little beyond briefly mentioning civil conspiracy principles; they did nothing to flesh out what the conspiracy was, when Salah joined it, who it was he conspired with, and so forth. *See id.* For its part, the district court simply pronounced Hamas a conspiracy without any discussion of the evidence that would support that pronouncement. 340 F.Supp.2d at 924. Merely mouthing the word "conspiracy" is not enough to render a defendant liable for the acts of a third party, and certainly not on summary judgment.

So the partial summary judgment against Salah on liability must also be reversed. The evidentiary record before the district court must be re-examined on remand. Unless the plaintiffs can identify evidence that would permit a reasonable factfinder to find that Salah's actions on behalf of Hamas in some way caused or contributed to David Boim's death, Salah will be entitled to summary judgment.

## V.

### Quranic Literacy Institute

As we mentioned in our summary of the proceedings on remand from *Boim I*, the Boims did not seek to resolve QLI's liability on summary judgment. Consequently, once the district court had entered partial summary judgment against HLF, AMS/IAP, and Salah, QLI was the sole defendant facing trial on liability. After QLI's requests to postpone the trial were denied, QLI elected to attend but not participate in the trial, doing nothing to challenge the plaintiffs' evidence or to present any evidence of its own.

▪ QLI contends that the district court abused its discretion in refusing to extend the trial date, but we reject the notion that the trial court was obligated to give QLI more time following the summary judgment ruling. The trial court's ruling on a continuance request is one that we review for abuse of discretion. *Research Sys. Corp. v. IPSOS Publicite,* 276 F.3d 914, 919 (7th Cir.2002). We will reverse the denial of such a request only when we are convinced the court below acted unreasonably. *Id.* (citing *N. Ind. Pub. Serv. Co. v. Carbon County Coal Co.,* 799 F.2d 265, 269 (7th Cir.1986)). As we noted in *Daniel J. Hartwig Assocs., Inc. v. Kanner,* 913 F.2d 1213, 1222–23 (7th Cir. 1990), the rare instances in which we have found the refusal of a continuance to constitute an abuse of discretion typically have involved an unexpected development to which counsel could not be expected to adjust without additional time. This was not such a situation. Although the district court did not resolve the summary judgment motions until three weeks before the trial was to commence, the court had set the trial date some five months earlier. Consequently, all of the parties, including QLI, had ample time to prepare for trial, and each of them was obliged to do so on the assumption that summary judgment would be denied. It is true that QLI suddenly found itself alone at the defense table, but this scenario was neither unforeseeable nor even unusual: pretrial rulings, settlements, and guilty pleas frequently cause co-defendants to drop out of a case at the last minute. Counsel for any defendant in a multi-defendant case, criminal or civil, must anticipate the possibility that his client may be the only defendant left when the trial date arrives and plan accordingly. Moreover, if an unexpected turn of events has deprived counsel of a reasonable opportunity to prepare for trial, he must make an appropriate record of

how the lack of additional time has concretely harmed his client. *See, e.g., United States v. Rinaldi,* 461 F.3d 922, 928–29 (7th Cir.2006) (defendant challenging the denial of continuance must demonstrate prejudice), *cert. denied,* —— U.S. ——, 128 S.Ct. 708, 169 L.Ed.2d 553 (2007). Generic complaints of surprise and unfairness will not suffice in this regard.

Although we find no abuse of discretion in the district court's decision to proceed with the trial as scheduled, we conclude that the court did err in another respect that requires us to vacate the judgment against QLI and to remand for further proceedings. As we have noted above, in advance of the trial and without any prior warning to QLI, the court deemed QLI bound by the court's finding on summary judgment against the other defendants that Hamas was responsible for David Boim's murder. *See* R. 659, Mem. Op. at 8. Consistent with that determination, the court advised the jury in its opening instructions that "[t]he terrorist group Hamas was responsible for the murder," R. 814–1 at 107, and the Boims' counsel relied on that finding in his opening and closing statements, *id.* at 126; R. 814–4 at 503.

■ Although a district court is not precluded from *sua sponte* granting summary judgment against a party, we have repeatedly warned that the court may not do so without first giving that party notice and the opportunity to respond. *See Pourghoraishi v. Flying J, Inc.,* 449 F.3d 751, 765 (7th Cir.2006) (coll. cases). QLI was deprived of that opportunity.

For that reason, we vacate the judgment against QLI pending further proceedings in the district court. It is possible that the court's error as to QLI may prove to have been harmless, but that is a matter to be sorted out on remand. Our decision to vacate the judgment against QLI is without prejudice to the Boims seeking summary judgment on the question of Hamas's responsibility for David Boim's murder, provided that QLI is given the opportunity to respond of which it was deprived in the first instance. If the Boims do move for summary judgment on this issue and the district court, on consideration of the evidence marshaled by the parties, concludes that there is no material dispute of fact as to Hamas's culpability for David Boim's murder, then the court properly may enter summary judgment in favor of the Boims on that issue. Given that QLI has otherwise shown no other defect in the trial or resulting verdict and damages award against it, the district court at that point should reinstate the judgment in favor of the Boims and against QLI. If, on the other hand, the court finds there to be a material dispute of fact as to Hamas's responsibility for the murder, then QLI will be entitled to a trial limited to that issue alone. A jury finding that Hamas was responsible for David Boim's death would, again, call for reinstatement of the judgment against QLI. A jury finding to the contrary would, of course, compel the entry of judgment in favor of QLI.

## VI.

We must briefly address the matter of a fees order entered against the defendants and/or their lawyers. When the Boims filed this lawsuit, the defendants not only moved to dismiss the complaint, but they also sought sanctions pursuant to Federal Rule of Civil Procedure 11. In a single sentence at the conclusion of its opinion denying the motions to dismiss and for sanctions, the district judge awarded the plaintiffs the fees and costs they had incurred in responding to the defendants' Rule 11 motions. *Boim v. Quranic Literacy Inst.,* 127 F.Supp.2d 1002, 1021 (N.D.Ill. 2001). However, the court did not explain the basis for the fee award nor did it

specify who, as between the defendants and their lawyers, was to pay the Boims their fees and costs. When the magistrate judge later ascertained, on review of the Boims' fee petition, the amount to which they were entitled, he clarified that the court had awarded the Boims their fees and expenses pursuant to Rule 11(c)(1)(A), which provides that "[i]f warranted, the court may award to the party prevailing on the [Rule 11] motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion." R. 184, Mem. Op. at 8. The magistrate judge also held that the defendants and their attorneys were to bear joint and several liability for the award. *Id.* at 20. But the rationale for both the award and the decision to make the defendants as well as their lawyers responsible for paying it remained somewhat murky. The magistrate judge rejected the suggestion that the defendants' attorneys alone should be liable, reasoning that the Boims had been awarded their fees and costs as the parties who prevailed on the Rule 11 motion rather than as a sanction against the defendants (and/or their lawyers) for filing a groundless Rule 11 motion. R. 184, Mem. Op. at 5–6, 20. Elsewhere in the same opinion, however, the magistrate judge stated that the decision to award the Boims the fees and expenses they had incurred in successfully opposing the defendants' Rule 11 motion "is specifically tailored to redress the *wrongful conduct* and is specifically authorized by Rule 11." *Id.* at 15 (emphasis added).

■ On this record, the award of fees and expenses was defective, as the Boims all but concede. *See* Boim Br. at 59. None of the court's opinions and orders on this subject make clear on what ground the district court believed that the award of fees and expenses was warranted nor why, in light of that rationale, the defen-

dants and their counsel were to be jointly and severally liable for the award. To the extent this was meant to be a fee-shifting award to the prevailing parties, it is not clear why liability was imposed on the defendants' attorneys. On the other hand, to the extent it was intended to be a sanction for "wrongful conduct," it is not clear why the defendants themselves were also held liable for the award. It may well be that either rationale would have supported the district court's discretionary decision to award the Boims their fees and costs. However, the reasonable exercise of the district court's discretion requires the court to articulate why such an award is warranted, why it is the defendants and/or their attorneys who are liable for the award, and, to the extent liability is imposed on the attorneys, who exactly among them is liable. *See Katz v. Household Int'l, Inc.,* 36 F.3d 670, 672–73 (7th Cir.1994); *Milwaukee Concrete Studios, Ltd. v. Fjeld Mfg. Co.,* 8 F.3d 441, 451 n. 18 (7th Cir.1993). Given the lack of clarity in the district court's opinions, the fee award can have no effect against any of the defendants or their counsel. The award of fees and expenses is therefore vacated.

## VII.

Before concluding our opinion, we find it necessary to say a few words about potential hearsay problems presented by certain aspects of the Boims' case. In attempting to establish the defendants' links to terrorism, the Boims have relied heavily on out-of-court statements like the Watson memorandum, the contents of which are offered for the truth of the matters asserted therein. The district court relied on these documents in its summary judgment rulings, satisfied that the statements were fully admissible. Although portions of these statements may be admissible for limited purposes, the proscription against hearsay

may render at least parts of these statements inadmissible for their truth. We direct the court on remand to undertake a careful evaluation of such statements to ensure that the Federal Rules of Evidence render them admissible for the purposes cited by the Boims. To aid in that evaluation, we note the potential problems posed by certain of the statements on which the Boims have relied.

*Watson Memorandum.* As we have noted, this memorandum was prepared by the Assistant Director of the FBI's Counterterrorism Division to document his recommendation that HLF be designated a terrorist organization by the Treasury Department's OFAC. The memorandum recounts at length the evidence that led Watson and his colleagues to conclude that HLF acted for or on behalf of Hamas. It primarily details the activities of HLF, naturally, but it also mentions the activities of Salah and representatives of AMS/IAP and makes a case for the notion that the activities of all of these defendants furthered the terrorist activities of Hamas. As the Watson memorandum set forth the basis for the government's decision to designate HLF an SDT, it was part of the administrative record before the court in the *Ashcroft* litigation.

 We may assume, as the district court held, that the Watson memorandum, insofar as it embodies the results of the government's investigation into HLF's ties to Hamas, is admissible in this proceeding pursuant to Federal Rule of Evidence 803(8)(B) as a public report setting forth "matters observed pursuant to duty imposed by law as to which matters there was a duty to report." 340 F.Supp.2d at 915 (citing *United States v. Sutton,* 337 F.3d 792, 797 (7th Cir.2003), and *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169, 109 Ct. 439, 450, 102 L.Ed.2d 445 (1988)). The foundation may leave a bit to be desired, as the Boims, rather than submitting an affidavit from Watson or any other FBI employee who participated in the preparation of the memorandum, submitted an affidavit from another government agent averring simply that the copy of Watson's memorandum tendered therewith was an accurate copy, that it had been prepared in the course of the FBI's regularly conducted activities, and that the memorandum was part of the administrative record in *Ashcroft.* R. 265–1 Ex. 12, Decl. of Samuel A. Simon, Jr. Nothing in the affidavit describes the circumstances under which Watson prepared the memorandum, though perhaps the memorandum speaks for itself in that regard.

More troubling, however, is the fact that the Watson memorandum repeats a number of statements from informants and other individuals (in some instances unnamed) who, in contrast to Watson, were under no official duty to report the matters addressed in their statements. Rule 803(8) deems a public report admissible based on the notion that its official author knows what he is talking about and will state the facts accurately: "[i]n effect, it is presumed that public officials perform their tasks carefully and fairly, without bias or corruption, and this notion finds support in the scrutiny and risk of exposure that surround most government functions." 4 Christopher B. Mueller and Laird C. Kirkpatrick, FEDERAL EVIDENCE § 8:86, at 770–71 (3d ed.2007). That presumption does not attach to the statements of third parties who themselves bear no public duty to report what they observe. *Id.* § 8:88, at 783–84. Unless such statements have an independent basis for admission under the Rules, they must be excluded. *See United States v. Patrick,* 248 F.3d 11, 22 (1st Cir.2001); *United States v. Ortiz,* 125 F.3d 630, 632 (8th Cir.1997); *United States v. Mackey,* 117

F.3d 24, 28–29 (1st Cir.1997); *Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir.1994); *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir.1991); *United States v. Pazsint*, 703 F.2d 420, 424–25 (9th Cir.1983); *see generally* Fed.R.Evid. 805; *Halloway v. Milwaukee County*, 180 F.3d 820, 825 (7th Cir.1999). Accordingly, the district court must evaluate any and all statements repeated within the Watson memorandum and relied on by the Boims to ensure that each is properly admissible.

*Websites attributed to Hamas.* To show that the murder of David Boim was the work of Hamas, the Boims submitted the declaration of Dr. Ruven Paz, a former member of the Israeli security community who describes himself as an expert in terrorism and counter-terrorism, Islamic movements in the Arab and Islamic world, Palestinian Islamic groups, and Palestinian society and politics. Based on his review of various exhibits submitted in connection with this case, his independent research, and his knowledge of how Hamas and other Islamic terror organizations operate, Paz concluded that Hinawi and Al–Sharif had murdered David Boim, that Hinawi and Al–Sharif were members of Hamas at the time they killed Boim, and that Hamas itself had accepted responsibility for the murder. R. 352 Ex. C ¶ 3.

We note that when it found on summary judgment that Hamas was responsible for the murder of David Boim, the district court did not rely on Paz's declaration. *See* 340 F.Supp.2d at 899. Instead, the court relied on the following: (1) evidence relating to Hinawi's conviction and sentence before a Palestinian Authority tribunal for his complicity in the murder; (2) a 1997 press release issued by the Government of Israel's Press Office indicating that Hinawi was a member of Hamas, that Hamas was responsible for the attack in which David Boim was killed, and that

Israel was seeking Hinawi's extradition for his involvement with the murder; (3) a 1997 *Jerusalem Post* news article indicating that Al–Sharif was a Hamas activist; (4) Stanley Boim's deposition testimony that, in the wake of his son's death, the media reported that Hamas had taken responsibility for the attack and it was public knowledge that Hamas was behind the attack; and (5) a default judgment had been entered against Hinawi, "which means, as a practical matter, that the Court accepts as true the well-pled allegations in the Complaint about him—that is, that he is a Hamas terrorist and one of two Hamas agents who carried out the attack on David Boim." *Id.* All of this evidence is problematic in one way or another. The default judgment against Hinawi cannot bind the other defendants, who did not default and consequently have the right to insist on proof that Hamas, Hinawi, and Al–Sharif were responsible for the murder. *The Mary*, 13 U.S. (9 Cranch) 126, 143, 3 L.Ed. 678 (1815) (Marshall, C.J.); *Pfanenstiel Architects, Inc. v. Chouteau Petroleum Co.*, 978 F.2d 430, 432–33 (8th Cir.1992); *Vale v. Bonnett*, 191 F.2d 334, 337 (D.C.Cir.1951); *see also United States v. Borchardt*, 470 F.2d 257, 260 (7th Cir.1972); *Hawkeye–Security Ins. Co. v. Schulte*, 302 F.2d 174, 177 (7th Cir. 1962). The press release, newspaper article, and Mr. Boim's recollection of media reports, all of them offered for their truth, necessarily constitute hearsay. Fed. R.Evid. 801(c); *e.g.*, *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 744–45 (7th Cir.1997); *Horta v. Sullivan*, 4 F.3d 2, 8–9 (1st Cir. 1993); *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 295 (5th Cir.1987). The evidence relating to Hinawi's conviction and sentence is problematic for the reasons we discuss separately below. *Infra* at 753–54. Recognizing these problems, the Boims on appeal have instead relied on Paz's declaration to supply the

requisite proof of Hamas's responsibility for David Boim's murder. But Paz's declaration has its own problems, which we now discuss.

■ In concluding that Al–Sharif was a member of Hamas and that Hamas had taken responsibility for the murder, Paz relied heavily on information set forth on certain websites that he attributed to Hamas. Paz explained that Hamas publicly acknowledges its terrorist acts and identifies its "martyrs" as a way to promote itself and to recruit new members. According to Paz, internet websites are a means by which Hamas disseminates such information. Paz's declaration asserts that scholars, journalists, and law enforcement routinely rely on the website postings of terrorist organizations for what they reveal about the activities of those organizations. R. 352 Ex. C ¶ 4(f). Looking to certain websites whose content he asserts is controlled by Hamas, Paz found statements indicating that Hamas had taken responsibility for the Beit–El attack that took David Boim's life and that Al–Sharif was one of the participants in this attack. Paz repeated these statements in his declaration. *Id.* ¶¶ 5(e), 5(h), 15; *see also* ¶ 5(d) (Palestinian Authority website).

Paz's reliance upon, and his recounting of, internet website postings demand a certain caution in evaluating his prospective testimony. Such postings would not be admissible into evidence for their truth absent proper authentication, and this would typically require some type of proof that the postings were actually made by the individual or organization to which they are being attributed—in this case, Hamas—as opposed to others with access to the website. *United States v. Jackson,* 208 F.3d 633, 638 (7th Cir.2000); *see also Lorraine v. Markel Am. Ins. Co.,* 241 F.R.D. 534, 555 (D.Md.2007). Paz's declaration identifies the websites from which

he quotes as ones controlled by Hamas, but it does not describe the basis for his conclusion, and consequently his declaration does not permit any independent assessment of the purported links between these sites and Hamas and the source of the postings that he recounts. Of course, the rules of evidence do not limit what type of information an expert may rely upon in reaching his opinion; even if that information would not otherwise be admissible in a court proceeding, an expert witness may rely upon it so long as it is the type of information on which others in the field reasonably rely. Fed.R.Evid. 703; *e.g., Britz v. Cowan,* 192 F.3d 1101, 1102–03 (7th Cir.1999); *Peabody Coal Co. v. Director, Office of Workers' Compensation Programs,* 165 F.3d 1126, 1128 (7th Cir. 1999). Indeed, Rule 703 now expressly permits the expert to disclose such information to the jury, provided the court is satisfied that its helpfulness in evaluating the expert's opinion substantially outweighs its prejudicial effect. *See also Nachtsheim v. Beech Aircraft Corp.,* 847 F.2d 1261, 1270–71 (7th Cir.1988). Nonetheless, a judge must take care that the expert is not being used as a vehicle for circumventing the rule against hearsay. *In re James Wilson Assocs.,* 965 F.2d 160, 173 (7th Cir.1992). Where, as here, the expert appears to be relying to a great extent on web postings to establish a particular fact, and where as a result the factfinder would be unable to evaluate the soundness of his conclusion without hearing the evidence he relied on, we believe the expert must lay out, in greater detail than Paz did, the basis for his conclusion that these websites are in fact controlled by Hamas and that the postings he cites can reasonably and reliably be attributed to Hamas.

*Documents related to Hinawi conviction.* Paz's conclusion that Hinawi was responsible for the murder of David Boim

was based in significant part on two documents related to Hinawi's trial and sentencing by a Palestinian Authority tribunal: (1) a set of notes prepared by a U.S. foreign service officer who attended Hinawi's trial in February 1998, and (2) an Arabic-language document purporting to be the written verdict reflecting Hinawi's conviction and sentence. R. 352 Ex. C ¶¶ 5(b), 5(c). The foreign service officer's notes indicate that Hinawi was tried in open proceedings for participating in a terrorist act and acting as an accomplice in the killing of David Boim, that he was afforded counsel by the tribunal, that he contended in his defense that his friend Al–Sharif was the gunman and that Al–Sharif exploited his friendship with Hinawi by asking him to drive the car, and that he was convicted on both charges and sentenced to ten years. *Id.* ¶ 5(b). Paz's declaration accepts these documents as genuine and relies principally on them for the proposition that Hinawi participated in David Boim's murder and was convicted by the Palestinian Authority tribunal for the same.

Once again we have concerns about whether the record as it stands lays an appropriate foundation for these documents. We can assume that the report of a U.S. government official who, in the course of his duties, observed a trial in a foreign tribunal may constitute proof of what occurred in that proceeding. We also have no doubt that a properly authenticated, official report of a judgment issued by a foreign tribunal constitutes adequate proof of that judgment. The difficulty we have with Paz's reliance upon these documents is that they have not been properly authenticated. The foreign service officer's notes are unsigned and reveal nothing about the circumstances under which they were prepared. *Id.* Ex. C, Attachment D; *see also* R. 300 Ex. 6. The document that we are told is the official verdict

is entirely in Arabic, is not readily evident as an official document, and is unaccompanied by an English translation. R. 463 Ex. C, Attachment E. There is a single cover note, on the letterhead of the U.S. Consulate General in Jerusalem, which accompanies these documents and explains what they are. *Id.* Attachment D; R. 300 Ex. 6. But the cover note itself is unsigned and does not even identify its author. This is unacceptable. We assume that Paz knows more about these documents and that he would not have relied upon them if he had doubts about their authenticity. But given that Paz relies almost exclusively on these documents as proof of Hinawi's complicity in Boim's murder, and because a factfinder could not evaluate the soundness of Paz's conclusion without knowing what these documents say, an appropriate foundation must be laid for these documents before the conclusions that Paz has drawn from these documents may be admitted.

There are other out-of-court statements that the Boims have relied upon directly or as the basis for witness testimony. We recognize that a case of this nature presents extraordinary challenges for a plaintiff and that resort to out-of-court statements will be necessary to show how international terrorist organizations and their accomplices operate. However, the Federal Rules of Evidence continue to govern, and the hearsay issues presented by such evidence demand careful attention and resolution.

## VIII.

Our dissenting colleague parts ways with us in two respects. He believes that the undisputed facts show conclusively that Hamas was responsible for the murder of David Boim and that, contrary to our impression, the district court both required proof of and found that the acts of defen-

dants AMS/IAP and Salah caused David's death.

With respect to Hamas's culpability for the murder, our point is not that an expert like Dr. Paz is foreclosed from relying on websites controlled by Hamas and/or Arab-language documents like Hinawi's judgment of conviction for information about who killed David Boim and whether they did so on Hamas's behalf. Our point is that when the plaintiffs rely solely on expert opinion to establish such facts, as the Boims have on appeal, the expert's declaration must reveal enough about his sources of information to permit the court to assess the reliability of his conclusions. For an expert to say simply that a given website is known to be a Hamas website, for example, such that the statements found on that website may be attributed to Hamas, without explaining how or why the site is known as a Hamas website, does not permit a court to exercise its gatekeeping function under Federal Rule of Evidence 702 to ensure that the conclusions the expert has drawn from that website are sufficiently reliable. *See, e.g., Naeem v. McKesson Drug. Co.,* 444 F.3d 593, 607–08 (7th Cir.2006). We do not doubt that the plaintiffs can fill in these and the other types of foundational gaps we have discussed, but unless and until they do, we cannot sustain the district court's summary determination that Hamas was responsible for David Boim's death simply because we think it likely to be true. The fact that the defendants have not offered contrary proof, *post* at 758, is beside the point. It is the Boims, not the defendants, who bear the burden of proof, and the defendants have no obligation to rebut facts that the plaintiffs have yet to establish with admissible evidence. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158, 160, 90 S.Ct. 1598, 1609, 1610, 26 L.Ed.2d 142 (1970); *Am. Nurses' Ass'n v. Ill.,* 783 F.2d 716, 729 (7th Cir.1986).

The notion that the district court both considered and found causation in fact, *post* at 759–61, simply cannot be squared with the record. One may search the district court's summary judgment decision from beginning to end and locate no such finding. Indeed, although our colleague believes that the court found causation, he cites no portion of the district court's opinion making such a finding. The Boims themselves have not ascribed any such finding to the district court; they have instead argued, incorrectly, that cause in fact need not be shown. It is true, as Judge Evans points out, that the district court looked for and identified evidence that the defendants had engaged in some act of helping Hamas. *Post* at 760. This is one of the elements of aiding and abetting that we discussed in *Boim I.* 291 F.3d at 1021, 1023. But proof that a defendant helped Hamas, with knowledge of its terrorist activities and the intent that those activities succeed, is not the same thing as proof that the defendant's aid actually caused a particular injury. Causation remains a distinct element of proof that must be satisfied if the defendant is to be held liable for aiding and abetting Hamas's tortious acts. *See* RESTATEMENT (SECOND) § 876 comment d (*"If* the encouragement or assistance is a substantial factor in *causing* the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act.") (emphasis ours), cited in *Montgomery v. Aetna Plywood, Inc.,* 231 F.3d 399, 413 n. 6 (7th Cir.2000). Otherwise, we would be saying that one who aids Hamas with the requisite knowledge and intent—whether by donating money to a Hamas-controlled school or by hosting a Hamas speaker at a conference, *see post* at 761 —is automatically liable for any and all of Hamas's later terrorist acts, regardless of whether the aid played any role whatsoever in bringing

those acts about. It may be that plaintiffs can demonstrate a causal link between the defendants' acts and the murder of David Boim, but they have yet to identify such proof and the district court has yet to consider it.

## IX.

The district court's task at this juncture is to apply the legal standards that we have discussed here to the parts of the case in which summary judgment was granted. Our key point here has been that knowledge, intent, and cause in fact must be proven, not assumed, with respect to each defendant.

■ Knowledge and intent may seem obvious, given the public face of a group like Hamas, but as we have explained, plaintiffs must nevertheless prove, for each defendant, knowledge and intent that their financial contributions (or other aid) to Hamas would support—directly or indirectly—Hamas's terrorist activities. *See supra* at 727–31; *Boim I*, 291 F.3d at 1011–12, 1014–15, 1021–24. An assumption that such proof will be easy is no substitute for the real thing. As we emphasized in *Boim I*, aiding and abetting liability can be imposed, in ordinary tort cases just as in this one, only when the alleged aider or abettor knows what it is helping and intends to help bring about the tortious result. *Id.* at 1020–21, 1023; *see also id.* at 1015. As *Boim I* went on to explain, it is proof of knowledge and intent that serves to distinguish the culpable tort-feasor from a party that is merely associating with and expressing its support for Hamas-conduct which, however repugnant, is protected by the First Amendment. *Id.* at 1023–24. However tempting it might be to skip past these requirements where a notorious organization like Hamas is concerned, we cannot do so without setting a

precedent that will apply to an untold number of cases in the future.

■ With respect to cause in fact, we began with the statute, which requires that a plaintiff be "injured ... by reason of an act of international terrorism." 18 U.S.C. § 2333(a). The only way to read this is as a requirement of proof of cause in fact. *See supra* at 739. Our basic point here has been that the statute does not demand an outright admission of responsibility for David Boim's murder (assuming that the terrorist act in question is that murder) or specific tracing of donations to Hamas or to the assassins (assuming that it is enough to show that the defendants aided and abetted a terrorist organization). Circumstantial evidence will also suffice. *See supra* at 741–42, 742–43. So far, however, that step has been skipped. On remand, the plaintiffs must demonstrate how (or show that there are no material issues of fact regarding how) the monetary donations from the defendant organizations supported the activities that grew to include the acts of terrorism. One way to do this, we suggested, would be to show that donations went into a central pool of funds that provided weapons and training for Hamas agents. *Supra* at 740, 741–42. Plaintiffs would need to show that Hinawi and Al–Sharif were affiliated with Hamas, but they would not otherwise have to show that funds from a particular defendant organization made their way to those two particular Hamas operatives. Another avenue would be to demonstrate that money from the defendant organizations went to Hamas for its charitable endeavors, and thereby freed up funds that Hamas could use for terrorist activities during the time period when David Boim was killed. *Supra* at 741–42. These examples do not exhaust the possibilities. A comparable

showing will, of course, have to be made as to defendant Salah as well. *See supra* at 741, 747–48.

The district court's error was to assume that only proximate causation needed to be proven. And it is indeed necessary in order to ensure that defendants are not held liable for remote risks of misuse of their funds. It is not, however a substitute for cause in fact. *Supra* at 740, 742. Proof of cause in fact (which may in the end be straightforward) and proof that defendants knew and intended to further Hamas's terrorist agenda (which may be less so) will follow the tort model that we found in *Boim I* that Congress intended to adopt. 291 F.3d at 1009–12, 1021–21; *supra* at 737–39. It will also ensure that liability under this statute will be imposed only through procedures that respect the rule of law. Arguments that proof of knowledge, intent, or cause in fact are too onerous in the context of terrorism are properly addressed to Congress, not us; we could not relieve the plaintiffs of any of these requirements without defying the manifest intent of Congress to incorporate traditional tort principles into section 2333.

Belief, assumption, and speculation are no substitutes for evidence in a court of law. However the plaintiffs might establish a line of proof connecting the defendants with the murder of David Boim, the law demands that they demonstrate such a nexus before any defendant may be held liable for David's death. We must resist the temptation to gloss over error, admit spurious evidence, and assume facts not adequately proved simply to side with the face of innocence and against the face of terrorism. Our endeavor to adhere to the dictates of law that this great nation has embodied since its founding must persevere, no matter how great our desire to hold someone accountable for the unspeakably evil acts that ended David Boim's life and created a lifetime of grief not only for the Boims but also for every other family scarred by terrorism.

## X.

For the foregoing reasons, we VACATE the judgments entered against defendants-appellants HLF, AMS/IAP, Salah, and QLI and REMAND for further proceedings consistent with this opinion. The parties shall bear their own costs of appeal. Circuit Rule 36 shall apply on remand.

EVANS, Circuit Judge, concurring in part and dissenting in part.

My review of this case causes me to conclude, as did Judge Keys, that the undisputed facts show that Hamas and its agents were responsible for the murder of David Boim. Furthermore, I cannot conclude that the judge failed to require a causal link between the defendants and the terrorist attack. For those reasons, I respectfully dissent, except as to the reversal of the judgment against the Holy Land Foundation. Given that the reader is probably suffering fatigue at this point, I will be brief.

As we made quite clear in *Boim I*, Congress intended for liability under § 2333 to attach "not only to the persons who committed terrorist acts, but to all those individuals and organizations along the causal chain of terrorism." That was the basis for our conclusion that, under the statute, liability attached to those who aided and abetted terrorist acts.

But exactly what that means is the problem. As the majority correctly states, it is "both a fair inference—and undisputed—that the murder of David Boim constitutes an act of international terrorism" and that he and his parents suffered injury. The majority also says that the individuals who killed him and Hamas (if the murder was committed "at its behest or with its sup-

port") would be liable to the Boims. But, the majority says,

> what has been vigorously disputed from the inception of this litigation is whether and under what circumstances persons and groups who allegedly have provided money and other support to Hamas (directly and indirectly) may also be liable for David's murder.

Clearly, *Boim I* settles the question of "whether"; the problem arises on the question "under what circumstances."

The majority says that in a "profound misreading" of *Boim I,* the district court (and the Boims) said that proof of cause-in-fact was not necessary but rather that proximate cause (i.e., foreseeability) was sufficient to establish liability. I do not agree that the district court failed to consider causation. I'll explain in a moment, but first, a slight detour.

The immediate cause-in-fact of the injury here was that two men gunned David down in what can only be considered a terrorist act. My first departure from the majority is in its apparent conclusion that the Boims failed to show that the two gunmen—Al-Sharif and Hinawi—and Hamas were in fact responsible for the murder, as AMS and IAP concede. I disagree with the majority's rejection of the expert opinion of Dr. Ruven Paz and the other evidence on which the district court relied in concluding that Hamas was, in fact, responsible for a murder it publicly took responsibility for. Dr. Paz is a former member of the Israeli security community who is an expert in terrorism in the Arab world and is fluent in Arabic. In reaching his conclusions, he analyzed many sources of data, including Web sites controlled by Hamas and documents related to Hinawi's trial and sentencing for Boim's murder. It seems particularly absurd for us to reject, as an underpinning for an expert opinion, what he believes to be the official verdict

against Hinawi in this matter. That it is written in Arabic is not at all surprising to me. As to the use of Web sites, Dr. Paz explains that

> Web sites of Islamic movements and terrorist organizations have long been accepted as important sources of information for scholars in this field, as well as for intelligence organizations and the press. The terrorist organizations rely on web sites to deliver their messages to their adherents and the general public. The United States Institute for Peace, a non-partisan federal institution created by Congress, has recently published an extensive report on the use of the internet by terrorists.

Dr. Paz attaches the report.

Furthermore, while defendants pick at the evidence the Boims have presented of Hamas involvement in David's murder, no defendant has produced any evidence which disputes Hamas's involvement. Looking at the issue *de novo,* I conclude— as did the district court—that the gunmen (Hinawi and Al-Sharif) and Hamas were the direct cause of the injury to the Boims.

But QLI argues that the finding that Hamas is responsible cannot be applied to it because it did not have a chance to litigate the issue. That is nonsense. QLI moved for summary judgment. In response, the Boims submitted a statement of facts, in which they produced evidence that Hamas was responsible for the murder. QLI could have offered evidence in response. Furthermore, at trial (when the judge instructed the jury that Hamas had been found responsible for the murder), QLI, who declined to participate in the trial because the judge did not grant a continuance, obviously did not object to the instruction. Therefore, the issue is waived. QLI cannot escape its waiver because it refused to participate in the trial.

Such behavior does not relieve one from the ordinary requirements of litigation.

I will now return to my main point and what the majority seems most concerned about—that is, what needs to be proven to establish that in fact the defendants before us aided the terrorists. The majority refers to this requirement variously as cause-in-fact, direct cause, factual cause, causal chain, and causal link. No one would seriously dispute that there must be a causal link between the defendants and the terrorist act. A person or entity knowingly giving money to another terrorist group is not responsible for a murder committed by agents of Hamas.

But just what does "causal link" mean in this context, and how must one prove that the link exists between the defendants and Hamas? The majority wisely declines to set up an absurd requirement that the money given to Hamas by the defendants must be traced directly to, say, purchasing the gun used in the attack. Money, the majority recognizes, is fungible. At times, though, it seems that the majority is requiring a pretty clear trail leading from a defendant to the specific act which caused David's death. For instance, the majority says that what "is strikingly absent from the district court's analysis is any consideration of a causal link between the assistance that the court found AMS/IAP to have given Hamas and the murder of David Boim." The majority also says that "there must be proof that the defendant aided and abetted [Hamas] in the commission of tortious acts that have some demonstrable link with David Boim's death." But then there is the statement that "[n]othing in *Boim I* demands that the plaintiffs establish a direct link between the defendants' donations (or other conduct) and David Boim's murder. . . ."

The majority's bottom line, with which I do not disagree, assuming I read it cor-

rectly, seems to be that what must be shown is that the defendant established a *funding network* or provided "general support" for terrorist activities; if that is established, then the fact finder could infer that establishing the network was a cause of Hamas terrorism. That is especially true if the funding was within a reasonable time of the terrorist act and if it was significant. In the words of the majority,

> if an individual or organization established a funding network in the United States designed to provide ongoing financial support for Hamas's terrorist activities, a factfinder might reasonably infer that the act of establishing that network was a cause of ensuing acts of Hamas terrorism, even if no line could be drawn linking a particular dollar raised to a particular terrorist act.

Further,

> Terrorist acts that follow within a reasonable time the donations and other support provided by a defendant to the perpetrators of those acts could be deemed to have been caused by those acts; and the more significant the support provided by a defendant, the more readily one might infer that support was a cause of later terrorist acts.

As an aside, two minor points: The reference to significance seems strange in light of other statements that even small contributions are sufficient. And there would seem to be no problem with timing in this case.

Where I part company with the majority is that I see nothing in the explanation of how to show a causal link that adds in any realistic sense to what Judge Keys required. I cannot see that he failed to consider whether there was a causal link. The statement that prompted the majority to believe that the court appears to have said that no such causal link was required is the following:

The Seventh Circuit did not say that, to impose liability under § 2333, the Boims have to link Mr. Salah or any of the other defendants specifically to the attack that killed David Boim; rather, the court held that, to impose liability for aiding and abetting—that is, providing material support to—a terrorist organization, the Boims need only show that the defendants knew of Hamas' illegal activities, that they desired to help those activities succeed, and that they engaged in some act of helping. . . . The evidence shows that all three are true with respect to Mr. Salah and no reasonable jury could find otherwise.

*Boim v. Quranic Literacy Inst.*, 340 F.Supp.2d 885, 923 (N.D.Ill.2004).

As I read the first part of this statement, the judge is saying there is no need for a direct link from Salah's activities to the specific attack that killed David Boim. But how is that different from what the majority says? And in fact the majority says that what Judge Keys said was not wrong:

> Nothing in *Boim I* demands that the plaintiffs establish a direct link between the defendants' donations (or other conduct) and David Boim's murder—that they funded in particular the terrorists who killed David Boim, for example. . . . In that respect, the district court was no doubt correct when it said that the Boims need not link the defendants specifically to the attack on David Boim.

Later, the majority reiterates that the judge was correct that a "direct link between Salah's actions and the killing of David Boim need not be shown." But, the majority continues, indirect causation is

required and "*Boim I* certainly did not relieve the plaintiffs of establishing some form of causal link between a defendant's actions and David Boim's murder."

As to the causal link, it seems to me that there is, at best, only a semantic difference between what the majority requires and what Judge Keys spent pages and pages examining. To reiterate, the majority says that what is required is, for instance, a funding network providing financial support of Hamas's terrorist activities, or other "general support" from which one can infer that the network was a cause of the acts of terrorism. By way of example, the majority said:

> Proof that HLF was funding Hamas's terrorist activities at the time of Boim's murder, and that another defendant was in turn funneling donations to HLF with the knowledge and intent that those funds be used to support Hamas's terrorism, might support an inference that the actions of both HLF and that defendant were causes of the murder.

Judge Keys said more than once that the Boims needed to show "that the defendants knew of Hamas' illegal activities, that they desired to help those activities succeed, and that they engaged in *some act of helping*." Emphasis added. 340 F.Supp.2d 885 at 923.[1] It seems to me that engaging in "some act of helping" is the same as providing funding or other general support to Hamas. It is precisely "financial support" or "general support" that Judge Keys was considering as a link between the defendants and Hamas terrorism, which was the cause of David Boim's death.

**1.** While commenting on this dissent, my colleagues say that I believe that "the undisputed facts show conclusively that Hamas was responsible for the murder of David Boim . . . ." But "conclusively" is not the issue. The plaintiffs' burden in this civil suit was to prove their case by a mere preponderance of the evidence, and that, I think, they have accomplished.

Our review of decisions on summary judgments is, of course, *de novo*. Therefore, a minor error, if there is one, in Judge Keys' phrasing is not fatal so long as our review of the undisputed evidence in the record supports the judgment. If it doesn't, the problem is with the evidence. But in my view, Judge Keys got it right on both the facts and the law.

A brief look at some of the evidence on which Judge Keys relied bears out my conclusion that he was, in effect, considering whether there was a causal link between a defendant's actions and Hamas terrorism and that, in fact, the evidence shows a causal link. As to Salah, the evidence includes that he took a trip to the Occupied Territories and Israel at the request of Mousa Mohammed Abu Marzook, the head of military operations for Hamas. The purpose of the trip was to revive those operations. He contributed money to Hamas operatives for the purpose of carrying out terrorist activities. He provided money to a Hamas operative to buy weapons to be used in terrorist operations. In a statement he gave while in Israeli custody, he describes meetings with Hamas operatives regarding military operations. Salah's response to the Boims' evidence is not to offer facts which dispute it, but primarily to move to strike the evidence on various grounds and to contend that his statement was procured by torture. Judge Keys carefully considered Salah's arguments but concluded that the evidence was reliable. My review of the record convinces me that the standard the majority has articulated for a causal link has been met as to Salah.

AMS/IAP published and distributed pro-Hamas documents, including one which contained an editorial that advocated martyrdom operations, meeting death with death, and killing Jews. In addition, AMS/IAP published documents designed to garner public support for Marzook. IAP held annual conferences and invited pro-Hamas speakers and paid for their travel expenses, even including at one conference a veiled Hamas terrorist. There is a significant amount of evidence which shows that they contributed money to HLF and that they encouraged others to donate, knowing the money went to Hamas and its military activities.

The latter evidence loses its force, of course, because, in a part of the majority's opinion with which I agree, the grant of summary judgment against HLF has been overturned. I agree that the district court erred in granting collateral estoppel effect to the decision in *Holy Land Foundation for Relief and Dev. v. Ashcroft,* 333 F.3d 156 (D.C.Cir.2003). Though if HLF is ultimately found to be liable, the evidence against AMS/IAP is strengthened as well. But I believe that, even without the evidence involving HLF, the Boims have shown AMS/IAP's "general support" for Hamas terrorist activities from which one can infer their actions were a cause of ensuing acts of Hamas terrorism.

AMS and IAP also appeal the finding that they were intertwined entities to a degree that made any distinction between them meaningless. My review of the facts on this point leads me to the same conclusion as the district court.

Accordingly, I respectfully dissent from the court's decision as to all defendants except HLF. As to HLF, I join the majority opinion.